# United States Court of Appeals

## For the Eighth Circuit

_____

No. 02-3103

_____

Andrew Sasser

*Petitioner - Appellant*

v.

Ray Hobbs, Director, Arkansas Department of Corrections

*Respondent - Appellee*

_____

No. 11-3346

_____

Andrew Sasser

*Petitioner - Appellant*

v.

Ray Hobbs, Director, Arkansas Department of Corrections

*Respondent - Appellee*

_____

Appeal from United States District Court
for the Western District of Arkansas - Texarkana

_____

Submitted: November 14, 2012
Filed: November 15, 2013
_____

Before RILEY, Chief Judge, WOLLMAN and MELLOY, Circuit Judges.
_____

RILEY, Chief Judge.

We consider Andrew Sasser's death penalty appeal for the third time. After an Arkansas jury sentenced Sasser to death in 1994 for capital murder, he lost his Arkansas direct appeal in 1995 and his effort to obtain postconviction relief in Arkansas state court in 1999. See Sasser v. State, 993 S.W.2d 901, 903 (Ark. 1999) (per curiam) (Sasser 1999); Sasser v. State, 902 S.W.2d 773, 774, 779 (Ark. 1995) (Sasser 1995). In 2000, Sasser filed the federal habeas petition from which this appeal arises. The district court dismissed the petition, but granted Sasser a certificate of appealability on several issues.

While Sasser's initial appeal to our court was pending, the Supreme Court decided in Atkins v. Virginia, 536 U.S. 304, 321 (2002), that the Eighth Amendment prohibits the execution of mentally retarded individuals. Retaining jurisdiction over the bulk of Sasser's case, we ordered the district court to determine in the first instance whether Atkins made Sasser ineligible for the death penalty. Without an evidentiary hearing, the district court denied Sasser relief, finding he had procedurally defaulted on his Eighth Amendment mental retardation claim. Considering Sasser's case for the second time, we reversed and remanded "for an Atkins evidentiary hearing to adjudicate the merits of Sasser's mental retardation claim." Sasser v. Norris, 553 F.3d 1121, 1122 (8th Cir. 2009) (Sasser I), abrogated on other grounds by Wood v. Milyard, 566 U.S. ___, ___, 132 S. Ct. 1826, 1834 (2012). The district court held a two-day evidentiary hearing and found Sasser was not mentally retarded under Arkansas law and Atkins. Sasser again appeals and, resolving all outstanding

issues presented by Sasser's original and subsequent habeas appeals, we affirm in part, dismiss in part, reverse in part, vacate in part, and remand.

## I.    BACKGROUND
### A.    Arkansas Proceedings

Shortly after midnight on July 12, 1993, Sasser brutally murdered Jo Ann Kennedy while she worked as a clerk at a Garland City, Arkansas, E-Z Mart convenience store. See Sasser 1995, 902 S.W.2d at 774-75. The State of Arkansas charged Sasser with capital felony murder. See id. at 774. In an effort to avoid the death penalty, Sasser's counsel attempted to plead Sasser guilty. See id. at 775. Because the State had not waived capital punishment—a predicate in Arkansas to acceptance of a guilty plea in a capital case—the trial court refused to accept the plea. See id. Proceeding to trial, Sasser stipulated to the following facts:

1.    Sasser "caused the death of the victim while in the possession of and while driving his brother's pickup truck";
2.    Sasser "stopped at the E-Z Mart in Garland City two or three times to buy chips and to use the telephone between the hours of 3:00 p.m. on July 11, 1993 and approximately 12:00 a.m. on July 12, 1993";
3.    "[T]he victim was discovered nude from the waist down"; and
4.    "[T]he pants and panties found in the E-Z Mart's men's bathroom were hers."

Id. At trial, in addition to evidence which overwhelmingly established Sasser's guilt, the State presented testimony from another E-Z Mart clerk, Jackie Carter, whom Sasser had attacked and raped on April 22, 1988. See id. at 776. The trial court admitted the testimony under the Arkansas equivalent of Federal Rule of Evidence 404(b). See id. at 777. After the State rested, Sasser's counsel presented no witnesses. See id. at 776. Without specifying which underlying felony or felonies

Sasser committed, the jury found Sasser guilty of capital felony murder. See id. at 776-77.

One aspect of the trial judge's instructions to the jury was concededly erroneous. See Sasser 1999, 993 S.W.2d at 905. The prosecution based its felony murder charge on "four possible underlying felonies: kidnapping, attempted kidnapping, rape, or attempted rape." Id. The trial judge correctly instructed the jurors that to reach a guilty verdict, they had to find Sasser committed at least one of the underlying felonies. See id. But the trial judge incorrectly defined the elements of attempted kidnapping and attempted rape, instructing the jury that either attempt crime was completed when Sasser formed the mental state to commit the corresponding offense. See id. at 905-06. The trial judge thus omitted the *actus reus* (i.e., the requirement that Sasser take a "substantial step" toward completing the crime) from the instructions related to the attempt felonies. Id. at 906.

In the penalty phase, the State introduced a certified copy of Sasser's 1988 conviction for the second-degree battery, kidnapping, and rape of Ms. Carter. See Sasser 1995, 902 S.W.2d at 777. Sasser's counsel called two witnesses during the penalty phase: a licensed professional counselor (LPC) and Sasser's older brother, Hollis. The LPC testified, "Sasser, in all probability, will always be a very dangerous man," but he "could probably function in the penitentiary." Hollis expressed his "sorrow and . . . deepest, deepest sympathy for" the victim's family, and testified Sasser "was a hard worker." Hollis had received reports from prison about Sasser that "were good." The State called a psychologist and a psychiatrist to rebut the LPC's testimony. The psychologist testified Sasser's IQ was "dull normal."

The jury imposed the death penalty, finding a single aggravating circumstance outweighed three mitigating circumstances. See id. The aggravating circumstance was Sasser's previous felony involving "the use or threat of violence to another person or creating a substantial risk of death or serious physical injury to another

person." Id. The three mitigating circumstances were that Sasser (1) "would be a productive inmate, [(2)] had a supporting family of him as an inmate, and [(3)] had stipulated he caused the victim's death." Id.

Sasser's trial counsel appealed, challenging only the admission of Ms. Carter's testimony. See id. at 774. On July 17, 1995, the Arkansas Supreme Court, with three justices dissenting, rejected this claim and affirmed the judgment and penalty. See id. at 779. Sasser next sought postconviction relief in Arkansas state court under Arkansas Rule of Criminal Procedure 37. See Sasser 1999, 993 S.W.2d at 903. In his Arkansas Rule 37 petition, Sasser raised five ineffective assistance claims and argued the incorrect jury instruction violated his Sixth Amendment right to a trial by jury. See id. at 905, 909-12. On July 8, 1999, the Arkansas Supreme Court affirmed the Arkansas circuit court's denial of relief on all claims. See id. at 912.

## B.   Federal Habeas Proceedings

On July 7, 2000, Sasser petitioned for a writ of habeas corpus in the Western District of Arkansas. Sasser amended his petition on July 17, 2001. In all, Sasser raised eight grounds for relief. The district court determined seven of Sasser's grounds were procedurally barred because he had not raised them in state court. Sasser had raised the eighth ground in the Arkansas Rule 37 proceeding—alleging Sasser's trial counsel provided ineffective assistance by failing to request a limiting instruction as to Ms. Carter's testimony. The district court found neither an evidentiary hearing nor relief were warranted because the decision "not to seek a limiting instruction was a plausible trial strategy" and the Arkansas court did not misapply clearly established federal law. The district court dismissed the petition on May 23, 2002. Sasser requested a certificate of appealability.

On August 14, 2002, the district court certified appealability on four of the eight grounds raised in Sasser's amended petition for writ of habeas corpus:

1. Petitioner was deprived of his rights under the U.S. Constitution . . . by the improper jury instructions given in both the guilt and penalty phases of the trial.

   . . . .

[2.] Sasser's conviction should be set aside because he was deprived of his right to effective assistance of counsel as guaranteed by the U.S. Constitution.

   . . . .

[3.] The additional oath administered to jurors who were questioned about their attitudes toward the death penalty [is unconstitutional].

[4.] The Arkansas death penalty is unconstitutional.

Sasser filed his first appeal to our court.

### 1.    First and Second Appeals

On August 15, 2003, in light of the Supreme Court's decision in Atkins, 536 U.S. at 321, we granted Sasser's motion to remand on "the question of whether [he] is mentally retarded and whether pursuant to Atkins . . . the Eighth Amendment prohibits his execution." In that judgment, we also granted Sasser permission "to file . . . a successive petition" "[t]o the extent the request for remand is the functional equivalent to an application to file a successive habeas petition." The State petitioned for rehearing, and on March 9, 2004, our court

> issued an amended judgment directing the district court to first determine whether Sasser had exhausted his claim in Arkansas state court and, if the district court determined Sasser had a viable state court remedy, to consider holding the remanded petition in abeyance pending resolution of the claim by the Arkansas state courts.

Sasser I, 553 F.3d at 1123.

On remand, after the district court ordered Sasser to file an amended petition setting forth his mental retardation claim, the district court dismissed the petition without a hearing, finding that Sasser procedurally defaulted on the Atkins claim by not raising a mental retardation claim under the Arkansas statute that predated Atkins. See Ark. Code Ann. § 5-4-618. For the second time, Sasser appealed.

On January 23, 2009, we reversed and remanded for an evidentiary hearing on Sasser's Atkins claim based on our decision in Simpson v. Norris, 490 F.3d 1029, 1035 (8th Cir. 2007), that Atkins created a new federal constitutional right and this right was "separate and distinct" from any preexisting Arkansas statutory right. See Sasser I, 553 F.3d at 1125-27.

### 2. Mental Retardation Hearing

Beginning on June 15, 2010, the district court held a two-day evidentiary hearing on Sasser's Atkins claim. Sasser first called three witnesses: his brother, Hollis; Dr. Jethro Toomer, a psychologist; and Professor Tom Smith, a special education expert. The State, in turn, called four witnesses: Dr. Roger Moore, a psychologist; Grant Harris; Sergeant John Cartwright; and Brian Hollinger. Sasser called one witness in rebuttal: Dr. Kevin McGrew, a psychologist. We recount only the evidence relevant to this appeal.

### a. Dr. Toomer's Testimony

Dr. Toomer evaluated Sasser in person, conducting an intelligence quotient (IQ) test: the Wechsler Adult Intelligence Scale, fourth edition (WAIS-IV). Dr. Toomer also administered several other psychological tests and interviewed numerous individuals about Sasser's background. Dr. Toomer concluded Sasser "met the criteria for mental retardation [in 1994]." He based his conclusion on qualitative factors in addition to evidence of Sasser's IQ scores, which were 79 in 1994, according to an earlier test, and 83 in 2010, according to Dr. Toomer's test.

Dr. Toomer testified the IQ score of 79 Sasser obtained in 1994 was based on an outdated set of scoring norms, resulting in an inaccurately high result. Specifically, the 1994 score was from the WAIS-R, a test whose scoring norms were developed in 1980. IQ scoring norms rapidly become outdated because an IQ score is a relative rather than an absolute measure: IQ tests including the WAIS-R and WAIS-IV are normed such that 100 is the mean score, meaning approximately 68% of the U.S. population would score between 115 and 85, one standard deviation (15 points) above and below the mean. Approximately 2% of the U.S. population would score 70 (i.e., two standard deviations from the mean) or below. For several decades, however, the U.S. population's average raw IQ score has risen each year.[1] See, e.g., James R. Flynn, Massive IQ Gains In 14 Nations: What IQ Tests Really Measure, 101 Psychol. Bull. 171 (1987). Thus, an IQ score of 100 under current scoring norms would likely have been close to 110 under scoring norms in effect thirty years ago. This change in IQ scoring norms over time is referred to as the "Flynn effect." See, e.g., Richard E. Nisbett et al., Intelligence: New Findings and Theoretical Developments, 67 Am. Psychologist 130, 148 (2012).

To correct for the Flynn effect, Dr. Toomer testified Sasser's IQ score from 1994 should be reduced by four points to 75, a score falling within the 70-75 outer range consistent with mental retardation. Cf., e.g., Jack M. Fletcher et al., IQ Scores Should Be Corrected For the Flynn Effect in High-Stakes Decisions, 28 J. Psychoeducational Assessment 469, 472 (2010) (finding IQ scores should be adjusted by a mean of 3 points per decade from the date scoring norms are developed). Dr.

[1]Although this rise in raw IQ scores is persistent and widely recognized, psychologists heavily debate its causes. See, e.g., Ted Nettelbeck & Carlene Wilson, The Flynn Effect: Smarter Not Faster, 32 Intelligence 85 (2004); Joseph L. Rodgers, A Critique of the Flynn Effect: Massive IQ Gains, Methodological Artifacts, or Both?, 26 Intelligence 337, 354 (1999) ("Even with a healthy dose of skepticism, the [Flynn] effect rises above purely methodological interpretation, and appears to have substantive import.").

Toomer testified that because of the measurement error inherent in IQ tests, a score of 75 indicated that Sasser's actual IQ almost certainly fell between 70 and 80 (i.e., an error of +/- 5 points). Dr. Toomer testified that Sasser's 2010 IQ score was likely higher because he had been in a structured prison environment for an extended period of time. Dr. Toomer explained, "research shows that what tends to be enhanced . . . is the area of verbal reasoning on people who have been incarcerated."

Dr. Toomer's diagnosis also relied on qualitative factors. Notably, Sasser had a long history of intellectual and academic difficulties. In high school, he was placed with students in the bottom performance level, indicating that he was a "special education" student despite the fact Arkansas, at the time, did not offer dedicated programs for "special education" students. His grades were consistently poor despite the simplicity of his classes. He was unable to graduate from high school; instead, the school gave him, like all students who failed to meet the minimum graduation requirements, a "certificate of attendance." Apart from time in prison, Sasser lived with his mother virtually his entire life, and he was unable to live independently. After high school, he attempted to join the army, but his dismal performance on the Armed Services Vocational Aptitude Battery (ASVAB) disqualified him. Apparently ashamed of telling his family of this failure, he spent several weeks pretending to be in the Army, hiding in an abandoned cabin in the woods near his mother's home and sneaking into her house to get food.

Sasser never had a checking account or a credit card, did not obtain a driver's license until he was twenty-eight years old, and had extraordinary difficulties performing even the simplest manual labor jobs. For example, he worked for a time at a chicken processing facility, where his supervisor rotated him through several jobs of decreasing difficulty, trying to find one Sasser could perform. In the end, the only job he was able to perform was the simplest task in the facility: pushing a button to dispense ice. Even a slightly more difficult task—color coding pallets—was too difficult because Sasser often mixed up the colors.

## b.      Dr. Moore's Testimony

Dr. Moore evaluated Sasser in person and conducted several psychological tests, but did not reassess his IQ.[2]  Dr. Moore concluded Sasser was not "mentally retarded as defined by Arkansas law."  Dr. Moore admitted Sasser had "borderline mental retardation or impaired cognitive functioning that falls into the upper 70s to low 80s."  But in Dr. Moore's view, "as th[e] term is statutorily and clinically defined, . . . [Sasser] does not suffer from mental retardation."   Dr. Moore based his conclusions primarily on the 1994 and 2010 IQ scores, but he also considered several qualitative factors.

As to Sasser's IQ, Dr. Moore agreed with Dr. Toomer that (1) the Flynn effect is "a genuine and real observation," and (2) norm obsolescence was a justified concern, but he opined that it was not appropriate to adjust the 1994 score for the Flynn effect.  Dr. Moore admitted, however, that the American Association on Intellectual and Developmental Disabilities (AAIDD)—the primary organization in the United States dealing with "the assessment and diagnosis of mental retardation"—considered it a "best practice[] in the diagnosis of mental retardation" to recognize the Flynn effect.  Dr. Moore disagreed with Dr. Toomer's scoring of the 2010 IQ test, contending that the score should have been 84 rather than 83. Stating no supportive research exists, Dr. Moore denied that spending time in a structured prison environment could raise IQ scores.  Dr. Moore testified that the "cutoff of mental retardation" was a score of 70.

As to qualitative factors, Dr. Moore opined that Sasser "appears to have adequate skills to cook for himself as needed, travel independently in the community, hold a job, take care of his personal needs and communicate effectively."  Dr. Moore noted that Sasser had maintained over time two significant relationships and fathered

---

[2]Because there are substanial "practice effects," Dr. Moore explained, it is not appropriate to administer multiple IQ tests in short succession.

a child. Dr. Moore pointed to a small bank loan obtained in Sasser's name as positive evidence of Sasser's adaptive functioning, but Sasser's brother actually procured the loan, completing all the necessary paperwork on Sasser's behalf.

### c.    Other Qualitative Evidence

Both psychologists considered firsthand accounts of Sasser's behavior by people who knew him before he turned eighteen years old. For example, one of Sasser's high school classmates, Janice Washington Briggs, described Sasser's limited interpersonal skills. "[I]f someone did or said something funny, [Sasser] laughed longer than everyone else in an inappropriate way [and] slobbered when he laughed," Briggs said. She said Sasser "was in Group III," and "[t]he students in Group III were Special Education students." After high school, Briggs remembered that Sasser entered into his first relationship, with a woman who "[l]ike [Sasser], . . . did not fit in." Dr. Toomer reported Sasser's "social interaction and communication skills" at age 45 "equate[d] with that of an average person age 7 years, 6 months."

### 3.    District Court's Mental Retardation Decision

Noting Atkins left it to the states to define mental retardation, the district court weighed the evidence presented at the hearing pursuant to the Arkansas mental retardation statute. See Ark. Code Ann. § 5-4-618. The district court interpreted Arkansas's mental retardation standard as follows:

> First, Sasser must have significantly subaverage general intellectual functioning. Second, the significantly subaverage general intellectual functioning must be accompanied by a significant deficit or impairment in adaptive functioning. Third, the significant deficit or impairment in adaptive functioning must manifest in the developmental period, but no later than age eighteen (18) years of age. Fourth and finally, Sasser must also suffer from a deficit in adaptive behavior.

-11-

Believing that Arkansas law strictly requires an IQ score of 70 or below, the district court concluded Sasser did not meet the first prong. As to the second prong, the district court found "the data underling [sic] the reports is simply inconclusive to show Sasser suffered significant deficits in adaptive behavior to the extent reported by Dr. Toomer."

Having decided Sasser did not meet the first two prongs, the district court saw no reason to consider the remaining prongs and concluded <u>Atkins</u> does not preclude Sasser's execution. Asserting the district court misconstrued Arkansas's mental retardation standard, Sasser moved to alter the judgment. The district court denied the motion, and Sasser again appeals.[3]

## II.    DISCUSSION

Recognizing the gravity of our task, we have carefully scrutinized the vast record and the voluminous filings in this case. We first set out the applicable standards of review and then address each of Sasser's arguments in turn.

### A.    Standards of Review

The legal standard applicable to an <u>Atkins</u> claim presents a pure question of law, which we review de novo. See <u>Atkins</u>, 536 U.S. at 317; <u>Raymond v. Weber</u>, 552

---

[3]Fewer than two weeks before oral argument on appeal, the State filed a letter allegedly authorized by Fed. R. App. P. 28(j). The letter consisted entirely of argument that could have been included in the State's brief. The most recent case cited was more than a decade old, although the State incorrectly said the case was more recent. Sasser moves to strike the letter, and we grant his motion. The letter violates our Rule 28(j), which authorizes only "setting forth the *citations*" of "pertinent and significant authorities [which] come to a party's attention *after* the party's brief has been filed . . . but before decision." Fed. R. App. P. 28(j) (emphasis added). Rule 28(j) is not a vehicle for parties to say what they could and should have argued in their briefs. See, e.g., <u>United States v. Thompson</u>, 560 F.3d 745, 751 (8th Cir. 2009).

F.3d 680, 683 (8th Cir. 2009); see also Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 855 n.15 (1982). Whether an individual is mentally retarded under the applicable legal standard, however, is a pure question of fact, which we review for clear error. See Ortiz v. United States, 664 F.3d 1151, 1164 (8th Cir. 2011); Raymond, 552 F.3d at 683. A district court's finding is clearly erroneous when "'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" Anderson v. City of Bessemer City, 470 U.S. 564, 573 (1985) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).

An ineffective assistance of counsel claim "presents a mixed question of fact and law," which we review de novo. United States v. White, 341 F.3d 673, 677 (8th Cir. 2003); see also Ortiz, 664 F.3d at 1164; Raymond, 522 F.3d at 683. The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d), precludes federal courts from granting habeas relief on claims adjudicated on the merits in state court unless the state court adjudication

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Williams v. Roper, 695 F.3d 825, 830 (8th Cir. 2012). AEDPA also bars federal courts from granting habeas relief if the petitioner has failed to exhaust available state remedies, unless the state remedies are ineffectual or non-existent. See 28 U.S.C. § 2254(b)(1).

**B.      Atkins Claim**

The Constitution does not require each person legally condemned to die to approach death with the metaphysical awareness of Socrates, but does require a minimum capacity to reflect on the somber nature of the sentence. In Atkins, the Supreme Court first fully recognized that "the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." Atkins, 536 U.S. at 321 (quoting Ford v. Wainwright, 477 U.S. 399, 405 (1986)). While referencing several clinical definitions of mental retardation, the Atkins court "'le[ft] to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" Id. at 317 (last two alterations in original) (quoting Ford, 477 U.S. at 416-17). Accordingly, subject to constitutional limits, we look to Arkansas law for the legal standard applicable to Sasser's mental retardation claim.

**1.      Arkansas Mental Retardation Standard**

Well before the Supreme Court decided Atkins, Arkansas provided a statutory right against execution for persons "with mental retardation at the time of committing capital murder." Ark. Code Ann. § 5-4-618. Since Atkins, the Arkansas Supreme Court has consistently construed its state's statutory right to be concurrent with the federal constitutional right established in Atkins. See Anderson v. State, 163 S.W.3d 333, 354-55 (Ark. 2004) ("We believe that the court in Atkins merely reaffirmed this State's preexisting prohibition against executing the mentally retarded."). Arkansas law defines mental retardation as follows:

> (A)      Significantly subaverage general intellectual functioning accompanied by a significant deficit or impairment in adaptive functioning manifest in the developmental period, but no later than age eighteen (18) years of age; and

> (B)      A deficit in adaptive behavior.

Ark. Code Ann. § 5-4-618(a)(1).

Arkansas places the burden of proving mental retardation "by a preponderance of the evidence" on the defendant. Id. § 5-4-618(c). To meet this burden, Sasser had to prove four factors by a preponderance of the evidence:

1. "Significantly subaverage general intellectual functioning";
2. "[A] significant deficit or impairment in adaptive functioning";
3. That both of the above "manifest[ed] . . . no later than age eighteen"; and
4. "A deficit in adaptive behavior."

Ark. Code Ann. § 5-4-618(a).

### a. Significantly Subaverage Intellectual Functioning

The first prong of Arkansas's mental retardation standard is consistent with clinical definitions of mental retardation. See, e.g., American Psychiatric Association (APA), Diagnostic and Statistical Manual of Mental Disorders 39, 41-43 (4th ed., Text Revision 2000) (DSM-IV-TR).

The psychiatric and psychological communities, including those specializing in the treatment of mental retardation, agree "[a] fixed point cutoff score for [mental retardation] is not psychometrically justifiable." AAIDD, Intellectual Disability: Definition, Classification, and Systems of Support 40 (11th ed. 2010). The DSM-IV-TR includes "an IQ of approximately 70 or below" in its definition of mental retardation.[4] DSM-IV-TR, supra, at 39. As we recognized in Jackson v. Norris, 615

---

[4]The APA's recently released Diagnostic and Statistical Manual of Mental Disorders 33, 37 (5th ed. 2013) (DSM-V), replaces the term "mental retardation" with "intellectual disability" and removes IQ score from the diagnostic criteria, explaining "IQ test scores are approximations of conceptual functioning but may be insufficient

F.3d 959 (8th Cir. 2010), "'it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior'" because there is "'a measurement error of approximately 5 points' [in assessing IQ], depending on the testing instrument." Id. at 965 n.7 (quoting DSM-IV-TR, supra, at 41-42); see also DSM-V, supra, at 37 ("Individuals with intellectual disability have [IQ] scores of approximately two standard deviations or more below the population mean, including a margin for measurement error . . . . [generally equivalent to] a score of 65-75."). In Atkins itself, the Supreme Court noted "an IQ between 70 and 75 or lower . . . is typically considered the cutoff IQ score for the intellectual function prong of the mental retardation definition." Atkins, 536 U.S. at 309 n.5.

If Arkansas's definition of mental retardation categorically excluded individuals who fell within the nationally accepted clinical definition of mental retardation, we might need to confront the difficult constitutional question whether Arkansas sufficiently protects "the range of mentally retarded offenders about whom there is a national consensus."[5] Id. at 317. Compare, e.g., id. ("As was our approach in Ford[] with regard to insanity, 'we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" (quoting Ford, 477 U.S. at 416-17)), with Panetti v. Quarterman, 551 U.S. 930, 950 (2007) (holding state procedures for preventing the execution of insane individuals "failed to provide . . . the minimum process required by Ford"). Out of

_____

to assess reasoning in real-life situations and mastery of practical tasks." In this case, however, we continue to rely primarily on the earlier version (the DSM-IV-TR) and refer to the diagnosis as "mental retardation," in accordance with the record and expert testimony before us.

[5]Indeed, the Supreme Court recently granted the petition for certiorari in Hall v. Florida, No. 12-10882, 2013 WL 3153535 (U.S. Oct. 21, 2013), which presents the precise constitutional question whether a state violates the Eighth Amendment Atkins right by imposing a strict IQ cutoff score of 70.

-16-

respect for the states' role in our federalist system, we will not assume—without a clear indication from the state's legislators or courts—that a state intends to stretch constitutional limits. See, e.g., Arizona v. United States, 567 U.S. ___, ___, 132 S. Ct. 2492, 2510 (2012) ("'So far as statutes fairly may be construed in such a way as to avoid doubtful constitutional questions they should be so construed; and it is to be presumed that state laws will be construed in that way by the state courts.'" (quoting Fox v. Washington, 236 U.S. 273, 277 (1915)); N.J. Payphone Ass'n v. Town of W.N.Y., 299 F.3d 235, 249 (3d Cir. 2002) (Alito, J., concurring) (explaining that "resolving [a] case on state-law grounds does less violence to principles of federalism and dual sovereignty" than does "invo[king] . . . federal supremacy over local laws").

Fortunately, there is no reason to interpret Arkansas law in a constitutionally questionable manner because post-Atkins cases decided by the Arkansas Supreme Court indicate that it has carefully avoided such a reading. Under Arkansas law, mental retardation is not bounded by a fixed upper IQ limit, nor is the first prong a mechanical "IQ score requirement." See, e.g., Anderson, 163 S.W.3d at 355-56 (finding that a mental health assessment relying on "achievement scores consistent with average intelligence" and "reading performance . . . on the high school level" potentially outweighed an IQ test score of 65). Neither does Arkansas law compel a finding of mental retardation below a certain IQ limit, although it establishes a "rebuttable presumption of mental retardation when a defendant has an intelligence quotient of sixty-five (65) or below." Ark. Code Ann. § 5-4-618(a)(2).

Simply put, an IQ test score alone is inconclusive of "significantly subaverage general intellectual functioning," Ark. Code Ann. § 5-4-618. See, e.g., Miller v. State, 362 S.W.3d 264, 277-78 (Ark. 2010) (reviewing a range of evidence other than IQ scores); Weston v. State, 234 S.W.3d 848, 857 (Ark. 2006) (concluding the trial judge properly considered not only the defendant's IQ score but also "the records and . . . mental evaluations, including the evidence suggesting that appellant was malingering"); Sanford v. State, 25 S.W.3d 414, 419 (Ark. 2000) (referring to an IQ

score of 75 as "in the borderline range"); Arkansas Model Jury Instructions – Criminal 1009-EXP (2d ed. 2012) (not definitively linking "significantly subaverage general intellectual functioning" to *any* IQ test score or range, but allowing, while not requiring, a finding of mental retardation upon a finding of an IQ of 65 or below).

### b.    Significant Deficit or Impairment

The second prong of the Arkansas standard is identical to the "adaptive functioning" prong of the DSM-IV-TR's diagnostic definition of mental retardation. See Jackson, 615 F.3d at 961-62, 965-66; DSM-IV-TR, supra, at 41-42.  As we said before, "[t]he second prong is met if an individual has 'significant *limitations* in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety.'"  Jackson, 615 F.3d at 962 (emphasis added) (quoting DSM-IV-TR, supra, at 41).

Consistent with nationally accepted clinical definitions of mental retardation, the Arkansas standard does not ask whether an individual has adaptive strengths to offset the individual's adaptive limitations.  See, e.g., id. at 962, 965-66; Miller, 362 S.W.3d at 277-78; cf. DSM-IV-TR, supra, at 39.  Instead, like the DSM-IV-TR diagnostic criteria, the Arkansas standard asks only whether an individual has at least two "significant limitations in adaptive functioning."  DSM-IV-TR, supra, at 39, 41. In Miller, for example, the Arkansas Supreme Court found "conflicting opinions and evidence" of defendant's adaptive behavior where almost all evidence indicated reasonably average functioning (e.g., defendant had "held a steady job for fourteen years" and had "kept up with financial transactions"), but there was evidence of two adaptive limitations (i.e., defendant had been in "special education classes from the third grade on" and had discipline-related difficulties on the job).  Miller, 362 S.W.3d at 277-78; see also Jackson, 615 F.3d at 966 (explaining the second prong could be satisfied by "significant limitations in two skill areas prior to age 18").

### c.     Manifestation of Symptoms Before Age Eighteen

The third prong of Arkansas's mental retardation standard, like the first two, mimics nationally accepted diagnostic criteria.  See, e.g., DSM-IV-TR, supra, at 41. Arkansas requires proof that both "[s]ignificantly subaverage general intellectual functioning" and "significant deficit or impairment in adaptive functioning" "manifest[ed] . . . no later than *age eighteen*."  Ark. Code Ann. § 5-4-618(a)(1) (emphasis added); see also Jackson, 615 F.3d at 961.  The DSM-IV-TR explains "[t]he onset must occur before *age 18 years*."  DSM-IV-TR, supra, at 41 (emphasis added).

### d.     Deficit in Adaptive Behavior

Although the fourth prong of Arkansas's mental retardation standard "does not appear in the DSM-IV-TR's criteria for mental retardation," the prong is fully consistent with nationally accepted diagnostic criteria.  Jackson, 615 F.3d at 966.  The fourth prong largely duplicates the second prong, but places "no age requirement on the evidence used to establish limitations in adaptive behavior."  Id. at 967.[6]

### e.     Timing of Proof

Timing affects a defendant's ability to prove all four prongs.  The Arkansas Supreme Court has consistently described the federal Atkins and state statutory rights as concurrent despite the fact that a plain reading of the Arkansas statute, Ark. Code Ann. § 5-4-618, and Atkins indicates a temporal inconsistency between the two rights.  The Arkansas statute bars the execution of those mentally retarded "*at the time of committing* capital murder," Ark. Code Ann. § 5-4-618(b) (emphasis added),

---

[6]To "avoid[] surplusage," Freeman v. Quicken Loans, Inc., 566 U.S. ___, ___, 132 S. Ct. 2034, 2043 (2012) (emphasis omitted), the fourth prong could be read to require a concurrent showing of an adaptive deficit, as opposed to before the age of eighteen.  But the Arkansas Supreme Court has not interpreted Ark. Code Ann. § 5-4-618(a)(1)(B) in this manner.  See Miller, 362 S.W.3d at 278 (considering evidence "from about age twelve to fourteen years" under the fourth prong).

while <u>Atkins</u> decided the Eighth Amendment bars "the execution *of a mentally retarded person*," <u>Roper v. Simmons</u>, 543 U.S. 551, 559 (2005) (emphasis added) (citing <u>Atkins</u>, 536 U.S. at 304). At first glance, one might read the federal and state rights differently, interpreting Arkansas's statute to protect only those mentally retarded at the time of *the offense* and the Eighth Amendment to protect only those mentally retarded at the expected time of *execution*. But Arkansas courts have consistently avoided such a reading of their state's statute:

> It is a violation of the Eighth Amendment's protection from cruel and unusual punishment to execute a person who *is* mentally retarded. [<u>Atkins</u>, 536 U.S. at 304.] Arkansas law *likewise* prohibits a death sentence for anyone who is mentally retarded *at the time of an offense*. Ark. Code Ann. § 5-4-618(b).

<u>Miller</u>, 362 S.W.3d at 276 (emphasis added). As interpreted by the Arkansas Supreme Court, the Arkansas statute thus overlaps with the Eighth Amendment, precluding the execution of an individual who can prove mental retardation *either* (a) at the time of committing the crime *or* (b) at the presumptive time of execution.[7]

From a medical perspective, this temporal distinction might matter because "Mental Retardation is not necessarily a lifelong disorder." <u>DSM-IV-TR</u>, <u>supra</u>, at 47. There is emerging evidence, based on genetic research, that certain forms of mental retardation may be treatable. <u>See</u>, <u>e.g.</u>, Aileen Healy et al., <u>Fragile X Syndrome: An Update on Developing Treatment Modalities</u>, 2 ACS Chem. Neurosci. 402 (2011). Furthermore, "appropriate training and opportunities" may enable certain individuals with mild mental retardation to develop sufficient "adaptive skills" to "no

---

[7]This is not to say the Eighth Amendment requires Arkansas to give defendants an opportunity to prove mental retardation using evidence from the time of commission. We merely recognize Arkansas has elected to define "mental retardation" for the purpose of proving mental retardation under <u>Atkins</u> in this manner. <u>See</u> Ark. Code Ann. § 5-4-618(b); <u>cf.</u> <u>Roper</u>, 543 U.S. at 559.

longer have the level of impairment required for a diagnosis of Mental Retardation." DSM-IV-TR, supra, at 47.

In most cases, timing will be more important as a legal matter because a mentally retarded individual may have better evidence of his condition at one point in life than another. Certain environments may artificially affect the scores obtained on common IQ tests just as practice effects may unmoor an individual's IQ score from his underlying intellectual capacity. Under Atkins and Ark. Code Ann. § 5-4-618(b), Arkansas may not execute an individual who sufficiently proves he met all four prongs of the Arkansas mental retardation standard at *either* relevant time, even if the individual lacks proof he satisfied the standard at *both* relevant times. See Miller, 362 S.W.3d at 276.

### 2. District Court's Legal Analysis

Having set out the applicable standard, we now turn to Sasser's case. Challenging the district court's finding that he was not mentally retarded, Sasser claims the district court erred as a matter of law by using an incorrect mental retardation standard. We must agree. Though looking to the right source—Arkansas law—the district court misconstrued the standard.

### a. Significantly Subaverage Intellectual Functioning

First, without any basis in Arkansas or federal law, the district court read a strict upper IQ limit into the Arkansas statute: "the Arkansas statute requires . . . *a score of 70 or below*." (Emphasis added). The district court even referred to the first prong of the Arkansas statute as an "IQ score requirement." Having adopted this interpretation, the district court confined its factual analysis to Sasser's 1994 and 2010 IQ test scores, concluding "[t]he only evidence before the Court to establish th[e first] prong is Sasser's 1994 IQ score, once the Flynn effect is applied to discount the score and a[n] assumption is made that Sasser's actual ability is at the lowest point in the confidence interval range [(i.e., 70)]." Arkansas law, the district court

believed, would not allow Sasser's "then-scored IQ range of 70 to 80 to demonstrate mental retardation, as suggested by the DSM-IV." Because Sasser had not obtained an IQ test score of 70 or lower on either the 1994 or 2010 intelligence tests, the district court found Sasser had not proved the first prong of the Arkansas standard by a preponderance of the evidence.

It was legal error to read a strict "IQ score requirement" into the Arkansas statute defining mental retardation.[8] As we have emphasized, IQ "test scores are imprecise and standing alone cannot support a diagnosis." Ortiz, 664 F.3d at 1168. As the Arkansas Supreme Court showed in case after case, the first prong encompasses more than mere IQ test scores. See, e.g., Weston, 234 S.W.3d at 857; Anderson, 163 S.W.3d at 355-56; Sanford, 25 S.W.3d at 419. In evaluating whether Sasser proved the first prong, the district court should have considered all evidence of Sasser's intellectual functioning rather than relying solely on his IQ test scores.

---

[8]The district court's error is understandable to the extent some Arkansas Supreme Court cases seem to blur the distinction between the rebuttable presumption of mental retardation, which hinges solely on IQ score, and the first prong of the mental retardation standard, which does not. See Miller, 362 S.W.3d at 278 ("[A]lthough there was no consensus among the expert opinions as to exactly what Miller's intelligence quotient was, all experts agreed that it was above 65."). A careful reading of Miller and the statute reveals the rebuttable presumption cuts across *all four* prongs, meaning a defendant with an undisputed IQ of 65 or below is not required to prove any of the four prongs to prevent execution. See Ark. Code Ann. § 5-4-618(a)(2); Miller, 362 S.W.3d at 278. This presumption, which in some cases offers a laxer alternative to the nationally accepted diagnostic criteria for mental retardation, is entirely consistent with, but not mandated by, Atkins. See Atkins, 536 U.S. at 317; Miller, 362 S.W.3d at 276-78; cf. DSM-IV-TR, supra, at 42 ("Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning."). The Arkansas Supreme Court's view that Atkins does not require Arkansas to adopt a rebuttable presumption of mental retardation when a defendant scores 75, rather than 65, is thus entirely correct. See Engram v. State, 200 S.W.3d 367, 373 & n.3 (Ark. 2004).

### b. Significant Deficit or Impairment

Second, the district court misunderstood the relationship between "a significant deficit or impairment in adaptive functioning" under Arkansas law, Ark. Code Ann. § 5-4-618(a)(1)(A), and the DSM-IV-TR diagnostic criteria (i.e., "significant limitations in adaptive functioning in at least two of [several] skill areas"), DSM-IV-TR, supra, at 41. As our decision in Jackson made clear, the Arkansas standard required the district court to recognize that if Sasser had more than one significant adaptive *limitation*, as defined by the DSM-IV-TR, then he had a "significant *deficit or impairment* in adaptive functioning" under Arkansas law, Ark. Code Ann. § 5-4-618(a)(1)(A). See Jackson, 615 F.3d at 961-62.

The district court looked for evidence of more than one significant *deficit* in adaptive behavior and concluded "Sasser has not shown significant adaptive *deficits* by a preponderance of the evidence." (Emphasis added). The district court found "Sasser had *limitations*, but no significant *deficits* in adaptive functioning." (Emphasis added). The question Arkansas law required the district court to answer was not whether Sasser had more than one significant *deficit* but whether Sasser had more than one significant *limitation*, as defined by the DSM-IV-TR. See Jackson, 615 F.3d at 962. Thus, the factual finding that Sasser had "limitations"—without specifying whether these limitations were significant under the diagnostic criteria—"but no significant deficits" misunderstands the issue.

The district court also held Sasser to the wrong legal standard by improperly offsetting limitations against abilities, even across skill areas. For example, the district court found it "clear Sasser struggled with job duties which involved labeling and grouping" (i.e., work skills), but balanced this limitation against Sasser's ability to "get along with co-workers" and be at work on time (i.e., social/interpersonal skills). Although Sasser has lived in prison or with his mother virtually his entire life, the district court found Sasser "was able to live on his own for a period of time" based

-23-

on the few weeks after Sasser failed the ASVAB and hid in an abandoned shed without electricity or running water.

This balancing approach was inconsistent with Arkansas law, which required Sasser to prove only two significant limitations in the DSM-IV-TR adaptive skill areas. See Jackson, 615 F.3d at 962. Under the district court's approach, even an individual with a prototypical case of mild mental retardation could not prove it. For example, although Sasser "was described as 'slow' by some," the district court emphasized that "no person who knew Sasser in the developmental period, even those trained in special education, regarded Sasser as mentally retarded." Yet as the DSM-IV-TR explains, individuals with mild mental retardation "often are not distinguishable from children without Mental Retardation until a later age," supra, at 43. As another example, the district court highlighted Sasser's ability to perform a job "within his abilities . . . reliably well." Again, the DSM-IV-TR explains that "[d]uring their adult years, [mildly mentally retarded individuals] usually achieve social and vocational skills adequate for minimum self-support." Id.

These legal errors mean the district court has not answered the question Atkins required it to answer: under Arkansas law, did Sasser prove by a preponderance of the evidence that he had "significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety"? DSM-IV-TR, supra, at 41; see Jackson, 615 F.3d at 961-62. Answering this question does not involve balancing strengths against limitations. It simply requires deciding whether the evidence

-24-

establishes significant limitations in two of the listed skill areas.[9] See DSM-IV-TR, supra, at 41.

### c.    Manifestation of Symptoms by Age Eighteen

Third, the district court thought the age prong applied only to the adaptive functioning prong of the Arkansas standard.  In this respect, the district court held Sasser to a lower standard than Arkansas law—and the DSM-IV-TR diagnostic criteria.  See Jackson, 615 F.3d at 961; DSM-IV-TR, supra, at 47.  The Arkansas standard actually required Sasser to prove the onset of his mental retardation, both the intellectual and the adaptive functioning prongs, occurred "no later than . . . eighteen years of age."  Jackson, 615 F.3d at 961.

### d.    Timing of Proof

Fourth, the district court's successive orders seem to rely on the clinical reality that mental retardation is normally a lifelong disorder to mix proof of Sasser's mental condition at the time he committed murder with proof from other periods.  Denying Sasser's motion for reconsideration, the district court said that it "never limited Atkins or the Arkansas statute . . . to mental retardation as it may have existed *at a single point in time*—be it contemporaneous with execution or with the offense." (Emphasis added).  In evaluating Sasser's adaptive functioning, the district court mixed and matched evidence of Sasser's capacities from different points in his life, creating a composite portrait of Sasser at a peak he never actually experienced rather than a distinct snapshot of Sasser's actual mental capacity at a single relevant point

---

[9]For example, the finding that "once a job was given to [Sasser] within his abilities, he was able to perform the job reliably well," misses the point: the question is not whether Sasser could perform a job "within his abilities," but whether "his abilities" *significantly* limited his performance of *normal* job-related tasks.  See Jackson, 615 F.3d at 962; DSM-IV-TR, supra, at 41.

in time.[10] It was error to ignore the temporal distinction underlying the Arkansas standard. See Ark. Code Ann. § 5-4-618(b); Miller, 362 S.W.3d at 276.

This timing mistake compounded the erroneous balancing approach to the second prong of the Arkansas standard. Mixing strengths and limitations from different periods of Sasser's life, the district court found "[t]here [wa]s simply not enough consistent information in the data to make any sort of reliable conclusion about [Sasser]'s actual performance of adaptive behaviors." The real question is whether Sasser proved "a significant deficit or impairment in adaptive functioning," Ark. Code Ann. § 5-4-618(a)(1)(A), at a relevant point in time, not whether the record provided a full picture of Sasser's mental condition *at all times* throughout his life. See, e.g., Miller, 362 S.W.3d at 276.

### 3. Effect of the Legal Errors

Although the district court judged Sasser's mental retardation claim by a legal standard that deviated from Arkansas law in several critical respects, even constitutional errors do not always require automatic reversal. See Fry v. Pliler, 551 U.S. 112, 120 (2007); Chapman v. California, 386 U.S. 18, 22 (1967); Fed. R. Crim. P. 52(a) ("Any error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."). The errors were certainly not structural, so we must decide whether "the error[s] w[ere] harmless." Neder v. United States, 527 U.S. 1, 8 (1999). We easily conclude the district court's error with respect to the third prong, holding Sasser to a lower standard than required by Arkansas law, was harmless. The other errors present closer questions. "Recognizing '[o]ur duty to search for constitutional error with painstaking care is never more exacting than it is

---

[10]The relevant points in time were (1) the time of the murder or the time of the hearing, and (2) for the purposes of the age prong, the period through age eighteen. See Miller, 362 S.W.3d at 276 (citing Ark. Code Ann. § 5-4-618(b)).

in a capital case,' we cannot say the[se] error[s] w[ere] harmless." Ortiz, 664 F.3d at 1166 (quoting Kyles v. Whitley, 514 U.S. 419, 422 (1995)).

The district court carefully summarized the evidence, and, recognizing the district court's "unique opportunity . . . to evaluate the credibility of witnesses and to weigh the evidence," Inwood, 456 U.S. at 855, we give deference to the district court's factual findings. See, e.g., Story v. Norwood, 659 F.3d 680, 685 (8th Cir. 2011). Yet misconceptions about the Arkansas legal standard led the district court to answer the wrong factual questions, leaving the pertinent questions unanswered.

As a result, we cannot say the legal errors were harmless unless no reasonable factfinder, applying the correct standard, could find Sasser mentally retarded. In light of Dr. Toomer's testimony about Sasser's intellectual functioning and evidence that Sasser had the communication and social skills of a seven-year-old, struggled with basic tasks like color-coding, failed to graduate from high school, never had a checking account, and did not obtain a driver's license until the age of 28, we cannot safely say it would be unreasonable to find Sasser mentally retarded. Cf., e.g., Ortiz, 664 F.3d at 1166 (concluding a district court's mistaken belief that a defendant obtained a driver's license was not harmless even though "the driver's license was but one of many facts upon which the district court relied").

The proper course, then, is to vacate the district court's finding that Sasser is not mentally retarded and remand so that the district court may answer the critical factual questions in the first instance according to the correct legal standard. See, e.g., Waldau v. Merit Sys. Prot. Bd., 19 F.3d 1395, 1402 (Fed. Cir. 1994) ("We therefore vacate the . . . decision . . . and remand for application of the correct legal standard to the facts of this case in light of this decision."); Bigge v. Albertsons, Inc., 894 F.2d 1497, 1503 (11th Cir. 1990) ("[W]e believe that the district court should reconsider the evidence in light of the correct legal standard.").

## C. Ineffective Assistance of Counsel Claims

At every turn in these proceedings, Sasser has raised new ineffective assistance of counsel claims or recast old claims in new ways. Having carefully scrutinized Sasser's numerous filings, we count no fewer than sixteen ineffective assistance of counsel claims raised under the umbrella of the second ground certified for appeal. All but four of these claims are procedurally barred, meritless, or both. See, e.g., Harrington v. Richter, 562 U.S. ___, ___, 131 S. Ct. 770, 784 (2011) (holding 28 U.S.C. § 2254(d) bars federal relief on a claim adjudicated in state court unless "there was no reasonable basis for the state court to deny relief"); Kennedy v. Delo, 959 F.2d 112, 117 (8th Cir. 1992) (holding claims raised for the first time on appeal are procedurally barred and constitute abuses of the writ).[11]

The four remaining claims, all related to the sentencing phase, assert that Sasser's trial counsel ineffectively failed to:

---

[11]We reject Sasser's contention his initial habeas counsel's purported ineffectiveness excuses his failure to raise claims in the district court. The case Sasser cites in support of this contention, Maples v. Thomas, 565 U.S. ___, ___-___, 132 S. Ct. 912, 922-24 (2012), is inapposite because (1) it applied to counsel's failure in *state* postconviction proceedings, and (2) it involved counsel who literally abandoned the client. The overwhelming evidence of Sasser's guilt renders harmless any purported ineffectiveness during the guilt phase.

We also reject Sasser's unusual exhaustion argument, which he raises for the first time in this appeal. Although a "*State* shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement," 28 U.S.C. § 2254(b)(3) (emphasis added), a habeas *petitioner* is not similarly protected by AEDPA. By failing to raise exhaustion below, Sasser waived whatever exhaustion argument he might have had. See Granberry v. Greer, 481 U.S. 129, 131 (1987) ("[F]ailure to exhaust state remedies does not deprive an appellate court of jurisdiction to consider the merits of a habeas corpus application.").

1. Prepare for the sentencing phase of the trial;

2. Obtain a timely psychological evaluation of Sasser;

3. Meaningfully consult with a mental health professional; and

4. Object "when the prosecutor misconstrued the mitigating evidence that the defense had presented concerning [Sasser's] mental impairment and lessened culpability" or to rebut that argument.

On these four potentially meritorious claims, Sasser is entitled to an evidentiary hearing in light of the Supreme Court's recent decision in Trevino v. Thaler, 569 U.S. ___, 133 S. Ct. 1911 (2013).

### 1. Trevino

In Martinez v. Ryan, 566 U.S. ___, ___, 132 S. Ct. 1309, 1315 (2012), the Supreme Court created a "narrow exception" to the Coleman rule that ineffective assistance of counsel in a state postconviction proceeding does not provide cause to excuse procedural default. Cf. Coleman v. Thompson, 501 U.S. 722, 753-54 (1991). The Supreme Court expanded this exception in Trevino, reasoning "a distinction between (1) a State that denies permission to raise [an ineffective assistance of counsel] claim on direct appeal and (2) a State that in theory grants permission but, as a matter of procedural design and systematic operation, denies a meaningful opportunity to do so is a distinction without a difference." Trevino, 569 U.S. at ___, 133 S. Ct. at 1921.

At issue in Trevino was Texas's procedural system, which the Supreme Court concluded "as a matter of its structure, design, and operation[] does not offer most defendants a meaningful opportunity to present a claim of ineffective assistance of counsel on direct appeal." Id. For practical reasons, Texas courts have "discouraged" defendants from bringing ineffective assistance of counsel claims on direct review, and the Supreme Court emphasized that Texas procedures make it "difficult, perhaps impossible," to develop the factual record required for an ineffective assistance claim

on direct appeal. Id. at ___, 133 S. Ct. at 1919. "What the Arizona law [considered in Martinez] prohibited by its explicit terms, Texas law precludes as a matter of course." Id. at ___, 133 S. Ct. at 1921.

Decisively for this case, Arkansas does not provide capital defendants with new counsel on direct appeal as a matter of course. See Ark. R. App. P.-Crim. 16(a)(i) ("Trial counsel, whether retained or court-appointed, shall continue to represent a convicted defendant throughout any appeal to the Arkansas Supreme Court or Arkansas Court of Appeals, unless permitted by the trial court or the appellate court to withdraw in the interest of justice or for other sufficient cause."). Indeed, the same allegedly ineffective lawyer represented Sasser, unsuccessfully, throughout his trial and direct appeal. Texas, by contrast, provides new appellate counsel as a matter of course and did so in the Trevino case, yet the Supreme Court still found Texas's procedure insufficient.

Although new appellate counsel is not, by itself, sufficient to guarantee capital defendants a meaningful opportunity to challenge their trial counsel's effectiveness on direct appeal, it is a necessary part of such a guarantee. Otherwise, appointed trial counsel must question his own effectiveness—a conceptually difficult task for several reasons, including trial counsel typically must be a witness in any ineffectiveness hearing. As the Arkansas Supreme Court recognized in Rounsaville v. State, 282 S.W.3d 759, 760 (Ark. 2008) (per curiam), "it is unrealistic to expect trial counsel, who is also appellate counsel, to call into question his own competence."

In Rounsaville, the Arkansas Supreme Court remedied this problem by appointing new counsel. See id. But the problem came to the attention of the court and trial counsel because the defendant himself "filed . . . a pro se motion for new trial based upon his claims of ineffectiveness of his current counsel." Id. at 759. The few reported cases in which an Arkansas defendant successfully obtained an ineffective assistance hearing on direct appeal all involved defendants who raised the

-30-

claims pro se or who had the means to hire new counsel. See Rounsaville v. State, 288 S.W.3d 213, 215, 220 (Ark. 2008); Missildine v. State, 863 S.W.2d 813, 817-18 (Ark. 1993); id. at 819 (Brown, J., concurring) (questioning "the wisdom of considering the issue of ineffective counsel on direct appeal" because it would incentivize "defendants to shuck trial counsel after trial and either proceed *pro se* or retain new counsel to pursue an ineffectiveness claim as part of post trial relief prior to direct appeal"); Halfacre v. State, 578 S.W.2d 237, 239 (Ark. 1979) ("After the appellants were convicted and sentenced, they wrote directly to the trial judge asking for a hearing on the question of effectiveness of their court-appointed counsel."). In most reported cases, the Arkansas Supreme Court has simply refused to consider ineffectiveness claims on direct appeal. See, e.g., Maxwell v. State, 197 S.W.3d 442, 445 (Ark. 2004); Ratchford v. State, 159 S.W.3d 304, 309 (Ark. 2004); Anderson v. State, 108 S.W.3d 592, 606 (Ark. 2003); Willis v. State, 977 S.W.2d 890, 894 (Ark. 1998).

Rounsaville and Halfacre indicate that if Sasser, acting pro se, had moved for a new trial based on his trial counsel's ineffectiveness, the trial court could and probably would have appointed new counsel. But a procedure to assure adequate representation cannot depend on a defendant's acting *without* representation. At best (i.e., according to the State's expert) Sasser has "borderline mental retardation or impaired cognitive functioning that falls into the upper 70s to low 80s." At worst, he is mentally retarded and has the communication and interpersonal skills of a seven-year-old. Either way, the State could not expect Sasser to understand the need and file a pro se motion for a new trial and appointment of new counsel.

As the facts of this case demonstrate, it is only possible for an indigent capital defendant to bring an ineffective assistance claim on direct appeal in Arkansas if (1) the defendant raises the claim pro se in the trial court or (2) the defendant's trial counsel "falls on his own sword" by moving for a new trial based on his own ineffectiveness and also moving for appointment of new counsel. Neither alternative

is sufficient in light of Trevino, and the latter alternative is especially troubling as a matter of professional ethics, potentially requiring trial counsel to choose between accurately asserting he was effective or inaccurately asserting that he was not. The first option would violate the lawyer's duty of zealous representation to his client and the second his duty of candor to the court. A direct appeal procedure predicated on such a conflict of interest does not present indigent capital defendants a viable opportunity to challenge their appointed trial counsel's effectiveness.

For these reasons, we conclude Arkansas did not "as a systematic matter" afford Sasser "meaningful review of a claim of ineffective assistance of trial counsel" on direct appeal. Trevino, 569 U.S. at ___, 133 S. Ct. at 1919.

### 2.    This Case

Trevino creates a two-part question: (1) did Sasser's state postconviction counsel fail to raise these four ineffectiveness claims, and (2) do these claims merit relief? Answering this question, Sasser says, requires an evidentiary hearing. Applying the law as it stood at the time, the district court deemed these claims procedurally barred and denied Sasser's request for a hearing. In the new light of Trevino, that denial was erroneous.

Sasser asserts that if given an opportunity to present new evidence, he could show his trial counsel failed to prepare for the sentencing phase by not (1) developing mitigating evidence of Sasser's limited mental capacities, and (2) interviewing Sasser's first victim, Ms. Carter, whose dramatic testimony during the guilt phase was an important factor supporting the jury's decision to impose the death penalty. According to Sasser's district court filings, Ms. Carter would have been prepared to testify during the sentencing phase that despite her ordeal, she did *not* believe Sasser deserved execution. Yet Sasser's trial counsel apparently never interviewed Ms. Carter and thus never learned what a compelling mitigation witness she might have been. Sasser also asserts that his trial counsel's general lack of preparation, including

-32-

a failure to obtain a timely psychological analysis and meaningfully consult with a mental health expert,[12] led to an inexcusable failure to present evidence of Sasser's intellectual difficulties and potential mental retardation.

Under Trevino, Sasser's postconviction counsel's alleged ineffectiveness, if proved, establishes "cause for any procedural default [Sasser] may have committed in not presenting these claims to the [Arkansas] courts in the first instance." Williams v. Taylor, 529 U.S. 420, 444 (2000); see Trevino, 569 U.S. at ___, 133 S. Ct. at 1921 ("[F]ailure to consider a lawyer's 'ineffectiveness' during an initial-review collateral proceeding as a potential 'cause' for excusing a procedural default will deprive the defendant of any opportunity at all for review of an ineffective-assistance-of-trial-counsel claim."). Thus, the district court is authorized under 28 U.S.C. § 2254(e)(2) and required under Trevino to "hold an evidentiary hearing on the claim[s]." See Williams, 529 U.S. at 437 (explaining § 2254(e)(2) does not preclude district courts from holding an evidentiary hearing if the petitioner "was unable to develop his claim in state court despite diligent effort").

As in Sinisterra v. United States, 600 F.3d 900, 912 (8th Cir. 2010), we must reverse the district court's denial of Sasser's request for an evidentiary hearing and vacate the district court's determination that these four claims are procedurally barred. On remand, after giving Sasser an opportunity to present evidence related to these four claims, the district court should determine whether any of these claims merits relief.

---

[12]Sasser's trial counsel called a witness whose testimony ("Sasser, in all probability, will always be a very dangerous man") could hardly have caused more self-inflicted damage to Sasser's mitigation case.

### D. Incomplete Jury Instruction Claim

Pointing to the trial court's admittedly incomplete definition of the elements of attempted rape and kidnapping, Sasser contends the error was structural or, at least, prejudicial. The State counters that the "independent and adequate state ground doctrine" precludes us from considering this claim. Coleman, 501 U.S. at 730. Assuming the State is wrong, Sasser's claim still merits no relief because the error was neither structural nor prejudicial.

Reviewing the trial court's jury instruction error, the Arkansas Supreme Court concluded the error was not structural. See Sasser 1999, 993 S.W.2d at 907. We agree. "[T]he omission of an element is an error that is subject to harmless-error analysis." Neder, 527 U.S. at 16; see also Sullivan v. Louisiana, 508 U.S. 275, 279 (1993). Given the overwhelming weight of evidence supporting Sasser's conviction, we "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." Neder, 527 U.S. at 19; cf. Sasser 1999, 993 S.W.2d at 908 ("[T]here is ample evidence in the record to support a finding of either kidnapping, attempted kidnapping, or attempted rape as the underlying felony for the capital murder charge."). Sasser "has presented no plausible argument," Johnson v. United States, 520 U.S. 461, 470 (1997), that his actions did not constitute kidnapping, attempted kidnapping, or attempted rape under Arkansas law. Even if the error were serious enough to preclude finding Sasser guilty of felony murder based on either of the attempt crimes, the error would still be harmless. Overwhelming evidence supported a conviction for felony murder based on the underlying felony of *completed* kidnapping, as to which the trial court correctly instructed the jury. Sasser is not entitled to habeas relief on this claim.

### III. CONCLUSION

We dismiss the claims Sasser attempts to raise for the first time on appeal. We affirm the district court's dismissal of all of Sasser's remaining claims with the exception of his Atkins claim and the four ineffective assistance claims meriting a

hearing under <u>Trevino</u>.[13] We vacate (1) the district court's denial of relief on these four claims, and (2) the district court's finding that Sasser is not mentally retarded under <u>Atkins</u>. We reverse the district court's denial of a hearing on the four potentially meritorious ineffective assistance claims. We remand for further proceedings consistent with this opinion, including (1) a hearing on the four ineffective assistance claims, and (2) a new <u>Atkins</u> finding under the appropriate standard.

---------------------------------

[13]In a conclusory manner, Sasser claims (1) the Arkansas death penalty statute is unconstitutional, and (2) requiring prospective jurors to take an additional oath before being questioned about their attitudes toward the death penalty is unconstitutional. Both claims are meritless under current, well-settled law. <u>See</u>, <u>e.g.</u>, <u>Lockhart v. McCree</u>, 476 U.S. 162 (1986); <u>Gregg v. Georgia</u>, 428 U.S. 153 (1976).