# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-1847

_____

Alvin Bernal Jackson

*Plaintiff - Appellant*

v.

Wendy Kelley,[1] Director, Arkansas Department of Correction

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Pine Bluff

_____

Submitted: January 11, 2018
Filed: August 7, 2018

_____

Before SMITH, Chief Judge, MELLOY and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Once more our Court faces the task of deciding whether Petitioner Alvin Bernal Jackson was improperly denied habeas corpus relief. This is Jackson's third

---

[1]Wendy Kelley has been appointed to serve as Director of the Arkansas Department of Correction, and is substituted as Appellee pursuant to Federal Rule of Appellate Procedure 43(c).

appeal to this Court seeking a finding that he is intellectually disabled under Ark. Code Ann. § 5-4-618(a)(1), which, in accordance with the Supreme Court's decision in Atkins v. Virginia, would exempt him from the death penalty. Atkins, 536 U.S. 304, 321 (2002) (finding "that death is not a suitable punishment for a mentally retarded criminal"). Jackson argues that the district court erred by creating and applying an additional intellectual disability test not present in either § 5-4-618(a) or Atkins and by applying the diagnostic criteria from the DSM-V[2] rather than the DSM-IV.[3] When the district court conducted its evidentiary hearing and issued its order, it did not have the benefit of the Supreme Court's decision in Moore v. Texas, 137 S. Ct. 1039 (2017). Because the Court in Moore gave significant instructions on how to analyze Atkins claims, we reverse and remand for the district court to consider Jackson's claims in light of that decision.

## I. Background

In 1990, Jackson was convicted for the capital murder of Charles Colclasure and sentenced to life in prison. While serving his sentence, Jackson killed Scott Grimes, a prison guard with the Arkansas Department of Correction. In 1996, he was convicted for the capital murder of Grimes and sentenced to death.

In 2003, Jackson filed a petition pursuant to 28 U.S.C. § 2254 raising an Atkins claim and asking that the court find him intellectually disabled and thus ineligible for the death penalty. Larry Norris, the former Director of the Arkansas Department of Correction, filed a motion for summary judgment claiming that Jackson's claim was procedurally defaulted and without merit. In 2007, the district court dismissed

---

[2]DSM-V stands for the American Psychiatric Association's (the "**APA**") Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013).

[3]DSM-IV stands for the APA Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000 Text Revision).

Jackson's claim as procedurally defaulted and denied Jackson's motion for a certificate of appealability. We granted Jackson a certificate of appealability on his Atkins claim and reversed and remanded the matter to the district court. Jackson v. Norris, 256 Fed. Appx. 12 (8th Cir. 2007) (per curiam) (unpublished).

On remand, the district court ordered Jackson to respond to Norris's pre-appeal summary judgment motion. Jackson responded and filed a motion for discovery and funds to retain experts. In 2009, the district court granted Norris's motion for summary judgment and dismissed Jackson's Atkins claim on the merits. Jackson again appealed, and we reversed and remanded, finding that Jackson was entitled to an Atkins hearing. Jackson v. Norris, 615 F.3d 959 (8th Cir. 2010).

Upon remand, the district court granted Jackson's motion for discovery and funds to retain experts. The court conducted an evidentiary hearing and heard from two experts: Dr. James Moneypenny, Jackson's expert, and Dr. Gilbert S. Macvaugh, III, Kelly's expert. The district court issued a detailed opinion, walking through the several tests administered to Jackson throughout his lifetime and the facts surrounding Jackson's crimes and incarceration. The court decided that the DSM-V definition of intellectual disability was the appropriate standard to use to determine whether Jackson was intellectually disabled. After parsing the DSM-V standard and the evidence presented at the hearing, the district court decided to credit Dr. Macvaugh's clinical opinion and found that Jackson was not intellectually disabled. Jackson now appeals.

## II. Discussion

Jackson essentially makes two arguments on appeal. First, he argues the district court erred in analyzing § 5-4-618(a) when it determined that he is not intellectually disabled. Second, he contends the district court erred in applying the

DSM-V's intellectual disability standard rather than the DSM-IV's because the DSM-V was not published at the time of his hearing.

*A. Intellectual Disability*

Jackson argues that the district court erred in finding that he was not intellectually disabled and is therefore eligible for the death penalty. "The legal standard applicable to an Atkins claim presents a pure question of law, which we review de novo. Whether an individual is mentally retarded under the applicable legal standard, however, is a pure question of fact, which we review for clear error." Sasser v. Hobbs, 735 F.3d 833, 841-42 (8th Cir. 2013) (internal citations omitted).

The Arkansas statute barring the execution of persons with an intellectual disability defines intellectual disability as follows:

> (A) Significantly subaverage general intellectual functioning accompanied by a significant deficit or impairment in adaptive functioning manifest in the developmental period, but no later than age eighteen (18) years of age; and
> (B) A deficit in adaptive behavior.

§ 5-4-618(a)(1). "[T]he Arkansas Supreme Court has consistently construed [this statute] to be concurrent with the federal constitutional right established in Atkins." Sasser, 735 F.3d at 842. Jackson bears the burden of proving his intellectual disability "by a preponderance of the evidence." § 5-4-618(c). To satisfy this burden, he must show:

> (1) "Significantly subaverage general intellectual functioning";
> (2) "[A] significant deficit or impairment in adaptive functioning";

(3) That both of the above "manifest[ed] . . . no later than age eighteen"; and

(4) "A deficit in adaptive behavior."

Sasser, 735 F.3d at 843 (alterations in original) (quoting § 5-4-618(a)).

The first prong of the analysis—intellectual functioning—"is typically measured with individually administered and psychometrically valid, comprehensive, culturally appropriate, psychometrically sound tests of intelligence." DSM-V, supra note 2, at 37. However, "[t]he psychiatric and psychological communities, including those specializing in the treatment of mental retardation, agree '[a] fixed point cutoff score for [mental retardation] is not psychometrically justifiable.'" Sasser, 735 F.3d at 843 (quoting AAIDD, Intellectual Disability: Definition, Classification, and Systems of Support 40 (11th ed. 2010)). "[W]here an IQ score is close to, but above, 70, courts must account for the test's 'standard error of measurement.'" Moore, 137 S. Ct. at 1049. In Moore, the Supreme Court explained that, because IQ tests are inherently imprecise, "an individual's score is best understood as a range of scores on either side of the recorded score." Id. When the lower range of the defendant's IQ score "falls at or below 70," courts are required to "consider other evidence of intellectual disability"—meaning courts must "move on to consider [the defendant's] adaptive functioning." Id. at 1049-50.

### 1. Subaverage General Intellectual Functioning

The first prong of Arkansas's intellectual disability statute—"significantly subaverage general intellectual functioning," § 5-4-618(a)—matches the first clinical diagnostic criterion for intellectual disability—deficits in intellectual functioning, DSM-V, supra note 2, at 33. In line with the Supreme Court and the DSM-V, we have previously held that courts should take into consideration a margin of error of

plus or minus five points on these tests because it is possible to diagnose intellectual disability "in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior." Sasser, 735 F.3d at 843 (internal quotation marks omitted); see also DSM-V, supra note 2, at 37. Again, "where an IQ score is close to, but above, 70, courts must account for the test's standard error of measurement." Moore, 137 S. Ct. at 1049 (internal quotation marks omitted). And, when "the lower end of the defendant's score range falls at or below 70," we must "move on to consider [the defendant's] adaptive functioning. Id. at 1049-50; see also Hall v. Florida, 134 S. Ct. 1986, 2001 (2014) (stating that additional evidence of intellectual disability included "testimony regarding adaptive deficits").

The district court, crediting Dr. Macvaugh's expert testimony, found that the IQ tests that Dr. Macvaugh and Dr. Moneypenny administered were inaccurate because Jackson was malingering. Assuming that Jackson was malingering on his most recent IQ tests, the court could still consider Jackson's scores from his childhood. The district court did not find that any of the IQ tests administered to Jackson before he was 18 were invalid. The court mentions the standard error of measurement in its order, but it does not specifically state that Jackson's previous tests, which respectively resulted in IQ scores of 72, 73, 74, and 81, should be adjusted for the standard error of measurement. Because the standard error of measurement is plus or minus 5 points, Jackson's adjusted range for his scores shows the possibility that his IQ could fall below 70. See Hall, 134 S. Ct. at 1995.

Though the district court did not specifically adjust Jackson's previous IQ scores according to the standard error of measurement, it appears to have followed the Supreme Court's directive in Hall that additional evidence of intellectual disability is required for scores that fall within the standard error of measurement. See id. at 2001. The court stated that "[e]specially in this case, an informed clinical judgment requires a comprehensive review of data that is relevant to Jackson's intellectual functioning." Recognizing this necessity, the court proceeded to devote

a significant portion of the order to discussing evidence of Jackson's adaptive functioning.

## 2. Adaptive Functioning

The second criterion for intellectual disability in both the DSM-V and the Arkansas Statute is a deficit in adaptive functioning. DSM-V, supra note 2, at 33; § 5-4-618(a). There are three adaptive-skills domains—conceptual, social, and practical. DSM-V, supra note 2, at 33. The DSM-V states that deficits in only one of the three adaptive-skills domains is sufficient to show adaptive deficits. Moore, 137 S. Ct. at 1050 (citing DSM-V, supra note 2, at 33, 38). The district court adopted the DSM-V's definition of intellectual disability and emphasized the explanatory text stating that "the deficits in adaptive functioning must be directly related to the intellectual impairments." DSM-V, supra note 2, at 38.

In Moore, the Supreme Court provided extensive direction on analyzing the adaptive functioning prong. Citing the diagnostic guidelines, the Supreme Court stated that the medical community focuses on adaptive *deficits* to determine intellectual disability and that significant limitations in adaptive skills are not outweighed by potential strengths in other adaptive skills. Moore, 137 S. Ct. at 1050 (citing AAIDD, supra at 47, and DSM-V, supra note 2, at 33, 38) (finding that the Texas Court of Criminal Appeals overemphasized the defendant's perceived adaptive strengths when it found that evidence of the defendant's adaptive strengths overcame considerable objective evidence of his deficits). Moreover, the Supreme Court cautioned against relying too heavily on adaptive strengths developed in controlled settings such as prisons. Id.

Here, the district court found that Jackson has, at the very least, intellectual deficits. Intellectual deficits would fall under the category of conceptual adaptive skills. DSM-V, supra note 2, at 37 ("The *conceptual (academic) domain* involves

-7-

competence in memory, language, reading, writing, math reasoning, acquisition of practical knowledge, problem solving, and judgment in novel situations, among others."). However, the court held that these deficits were not directly related to intellectual impairments because Jackson also exhibited adaptive functioning strengths. Throughout the order, the district court relied heavily on Jackson's perceived adaptive functioning strengths rather than his deficits, citing to evidence that Jackson: could drive a car; has filed pro se lawsuits while in prison; has filed intra-prison grievances; has submitted commissary and law library requests; can recall information about these lawsuits and requests; has used vocabulary that is generally inconsistent with intellectual disabilities; has asked Dr. Macvaugh several questions about his qualifications and the tests he was administering; and, to get around a prohibition on inmate correspondence with other inmates, utilized a complex method of letter delivery. Furthermore, almost all of the skills that the district court appears to have given significant weight are those that Jackson may have developed in prison, which, according to Moore and the DSM-V, should not be heavily relied upon. Moore, 137 S. Ct. at 1050; DSM-V, supra note 2, at 38. Thus, the district court, like the court of appeals in Moore, inappropriately found that Jackson was not intellectually disabled because his adaptive strengths outweighed his adaptive deficits.

Furthermore, the Supreme Court also found in Moore that "[t]he existence of a personality disorder or mental-health issue, in short, is not evidence that a person does not also have intellectual disability." Moore, 137 S. Ct. at 1051 (internal quotation marks omitted) (finding that the court of appeals erred when it used academic failure and childhood abuse to detract from a determination that the defendant's intellectual and adaptive behaviors were related); see also United States v. Wilson, 170 F. Supp. 3d 347, 371 (E.D.N.Y. 2016). The Court stated that "many intellectually disabled people also have other mental or physical impairments" and the medical community actually uses those experiences as "risk factors," causing clinicians to further explore the possibility of intellectual disability rather than

"counter[ing] the case for a disability determination." Moore, 137 S. Ct. at 1051; see also Wilson, 170 F. Supp. 3d at 371.

Like the court of appeals in Moore, the district court found that Jackson's diagnosis of anti-social personality disorder, coupled with his untreated childhood ADHD, conduct disorders, and communications disorders, indicated that his adaptive deficits were not related to subaverage intellectual functioning. However, prior to issuing it's order, the district court did not have the benefit of the Supreme Court's finding that the existence of additional personality disorders or mental-health issues is not evidence weighing against an intellectual disability determination. In light of the Court's decision in Moore, we believe the district court erred by placing too much emphasis on the existence of other diagnosed disorders to find that Jackson was not intellectually disabled.

The court also tried to bolster its adaptive functioning analysis by comparing Jackson's conduct in his underlying crimes to the Supreme Court's justifications in Atkins for exempting intellectually disabled persons from execution. In finding that intellectually disabled offenders were ineligible for the death penalty, the Supreme Court explained that:

> Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

Atkins, 536 U.S. at 318. In Tennard v. Dretke, the Supreme Court stated that "impaired intellectual functioning is inherently mitigating . . . . Nothing in [Atkins] suggested that a mentally retarded individual must establish a nexus between her mental capacity and her crime before the Eighth Amendment prohibition on executing her is triggered." Tennard, 542 U.S. 274, 287 (2004).

The district court compared the underlying facts of Jackson's crimes to the Atkins justifications. Relying on Jackson's strengths as displayed in those crimes, the court found that his actions did not align with the justifications for exempting mentally disabled persons from the death penalty, thereby proving he is not intellectually disabled. By analyzing Jackson's crimes in light of the Atkins justifications, the district court has essentially required Jackson to prove that there was a nexus between his mental capacity and his crime—i.e., that his criminal conduct reflected his mental disability. However, it is not necessary for Jackson's crime to be related to his intellectual disability: it is only necessary for Jackson to actually be intellectually disabled to be exempt from the death penalty. See Atkins, 536 U.S. at 321. That Jackson's potential adaptive strengths were used to commit these crimes does not mean that adaptive deficits related to subaverage intellectual functioning do not exist. See Moore, 137 S. Ct. at 1050. Again, the district court balanced Jackson's strengths against his deficiencies to find that he was not intellectually disabled, which, subsequent to the district court's order in this case, the Supreme Court has directed courts not do. See id.

Furthermore, we are given pause because Kelley's own expert, Dr. Macvaugh, who the district court credits, gave a clinical opinion but refused to give a forensic opinion on intellectual disability, stating in the hearing that if Jackson "has mental retardation, it's not by much. If he doesn't have it, it's not by much." R. at 295. The indecisiveness of Kelley's expert, coupled with the district court's brief reference to Jackson's deficits but heavy emphasis on his strengths, is concerning. Accordingly,

we find that the district court committed clear error in finding Jackson's adaptive behavior deficits were not related to subaverage intellectual functioning.

### 3. Manifestation No Later Than 18

The third criterion in § 5-4-618(a) and the DSM-V is that both subaverage general intellectual functioning and a significant deficit or impairment in adaptive functioning manifested no later than age 18. § 5-4-618(a); DSM-V, supra note 2, at 33. The parties agree and the district court found that the third prong requiring deficits to be present before Jackson turned 18 was satisfied. The evidence presented at the hearing—Jackson's childhood IQ scores, reports from his schools and other institutions about his behavioral issues, and testimony from both experts—shows that Jackson fell within the standard error of measurement for subaverage intellectual functioning and demonstrated adaptive functioning deficits prior to the age of 18. Thus, we find that the district court did not clearly err in determining that this factor was satisfied.

### 4. Deficit in Adaptive Behaviors

The final factor in § 5-4-618(a) is a deficit in adaptive behaviors. In Sasser, this Court found that although the DSM-IV does not have a fourth prong, "Arkansas's mental retardation standard . . . is fully consistent with nationally accepted diagnostic criteria. The fourth prong largely duplicates the second prong, but places no age requirement on the evidence used to establish limitations in adaptive behavior." Sasser, 735 F.3d at 845 (internal citations and quotation marks omitted). Accordingly, the same evidence used to prove the second prong is used prove the fourth prong. As a result, our same analysis under the second prong applies to the fourth prong. For the reasons stated above, we hold that the district court clearly erred in finding that Jackson's adaptive behavior deficits were not related to subaverage intellectual functioning.

## B. Application of the DSM-V Standard

Jackson next argues that the district court erred when it applied the DSM-V rather than the DSM-IV standard for intellectual disability. At the time the <u>Atkins</u> hearing took place, the DSM-IV was the most recent version of the APA's diagnostic manual. The DSM-IV contained no specific requirement that an individual's adaptive behavior deficits be caused by that person's subaverage intellectual functioning. DSM-IV, <u>supra</u> note 3, at 39-49. Dr. Macvaugh testified that he could not be sure that Jackson's deficits were due to subaverage intellectual functioning and that he believed the medical field is not clear about whether the adaptive deficits have to be caused by subaverage intellectual functioning. R. at 356.

The DSM-V was published after Jackson's <u>Atkins</u> hearing. Though it does not specify the need for a direct relationship between adaptive deficits and subaverage intellectual functioning in the diagnostic criteria, the explanatory text states that "[t]o meet diagnostic criteria for intellectual disability, the deficits in adaptive functioning must be directly related to the intellectual impairments described in [prong one]." DSM-V, <u>supra</u> note 2, at 38. The district court decided to adopt the DSM-V's standard and found that Jackson had shown intellectual deficits and that both experts had identified adaptive deficits in a number of areas. However, the court also found Jackson failed to show that those deficits were directly related to subaverage intellectual functioning. Jackson argues that the application of the DSM-V standard is inappropriate because that is not the standard under which the parties argued the case. Thus, he claims he was not on notice that he needed to present evidence of a direct connection between his adaptive behavior deficits and his subaverage intellectual functioning. Accordingly, Jackson requests that we remand the case and allow him to present evidence on this connection.

In <u>Moore</u>, the Supreme Court reversed the court of appeals' finding that the state habeas court erred when it applied the most recent medical guidelines to

determine intellectual disability rather than the 1992 guidelines that the court of appeals had adopted in a previous case. Moore, 137 S. Ct. at 1044. Quoting its decision in Hall, the Supreme Court stated that "[e]ven if 'the views of medical experts' do not 'dictate' a court's intellectual-disability determination . . . the determination must be 'informed by the medical community's diagnostic framework.'" Id. at 1048 (quoting Hall, 134 S. Ct. at 2000). The Court added that in its decisions, it "relied on the most recent (and still current) versions of the leading diagnostic manuals—the DSM-5 and AAIDD-11." Id. In Hall, the Supreme Court stated that it need not interpret the Constitution in isolation and "the professional community's teachings are of particular help in . . . case[s] where no alternative definition of intellectual disability is presented and where this Court and the States have placed substantial reliance on the expertise of the medical profession." Hall, 134 S. Ct. at 2000 ("Atkins itself points to the diagnostic criteria employed by psychiatric professionals."). The Court's decision in "Hall indicate[s] that being informed by the medical community does not demand adherence to everything stated in the latest medical guide. But neither does [the Court's] precedent license disregard of current medical standards." Moore, 137 S. Ct. at 1049. Accordingly, we find it was not error for the district court to apply the DSM-V standard.

However, we also find that there is no material difference between the DSM-V standard and the DSM-IV with regard to the connection between subaverage intellectual functioning and adaptive behavior deficits. Though the DSM-V's language may appear to create a heightened standard, it is actually "claryif[ying] the most logical approach to a diagnosis of intellectual disability." United States v. Wilson, 170 F. Supp. 3d 347, 371 (E.D.N.Y. 2016). The DSM-V does not require a showing of specific causation; rather, as the district court found in United States v. Wilson:

[t]he court assumes that a clinician would not diagnose intellectual disability on the basis of adaptive functioning deficits that were related to something else entirely, such as a physical disability or traumatic

-13-

event. However, where an individual has demonstrated significantly subaverage intellectual functioning, along with significant adaptive deficits that relate to such intellectual impairment, that individual has satisfied the first two diagnostic criteria for intellectual disability. To require this individual to further prove that he satisfies these criteria because he is intellectually disabled would render the criteria meaningless. Indeed, [that] approach would transform the standard for intellectual disability into an impossible test: In order for a defendant to show that he was intellectually disabled, he would need to prove that he satisfied the criteria because he was intellectually disabled. As though trapped on an M.C. Escher staircase, the defendant would climb to the top only to find he had returned to the bottom.

Id. Moreover, "a defendant is not required to rule out other contributing causes of his adaptive deficits in order to meet the standard for intellectual disability." Id.; see also Moore, 137 S. Ct. at 1050.

Here, the district court appears to have required a specific showing of causation by expecting Jackson to "rule out other contributing causes of his adaptive deficits." Wilson, 170 F. Supp. 3d at 371; see also Moore, 137 S. Ct. at 1050. The court recognized that Jackson has adaptive behavior deficits, but it heavily emphasized Dr. Macvaugh's testimony that he was unable to determine whether Jackson's adaptive behavior deficits were due to subaverage intellectual functioning or another condition. Therefore, the district court found, Jackson did not have an intellectual disability because he did not demonstrate a specific link between the deficits and subaverage intellectual functioning.

This was error. Jackson is not required to demonstrate a specific connection between subaverage intellectual functioning and adaptive behavior deficits. Rather, he must show only that deficits related to intellectual functioning exist. Furthermore, as discussed earlier, Jackson's other diagnoses are frequently co-occurring with intellectual disability, see DSM-V, supra note 2, at 40, and Jackson is not required to exclude those disorders as causes of his adaptive behavior deficits, see Wilson, 170

-14-

F. Supp. 3d at 371. As the court in <u>Wilson</u> found, it would be too much to "ask[] the court to break down each deficit and determine what portion of each is attributable to a learning disability, emotional disturbance, ADHD, or a conduct disorder," and "such an approach would [not] comply with the legal requirement, as articulated by <u>Hall</u>, to avoid the 'unacceptable risk that persons with intellectual disability will be executed' in violation of the Eighth Amendment." <u>Id.</u> at 372 (quoting <u>Hall</u>, 134 S. Ct. at 1990).

### III. Conclusion

We make no judgment as to whether or not Jackson is intellectually disabled, but find that the exacting review required in death penalty cases commands further consideration of this matter. <u>See</u> <u>Ortiz v. United States</u>, 664 F.3d 1151, 1166-67 (2011) ("Because we cannot be fairly certain the error was harmless, we find it appropriate to remand [the] <u>Atkins</u> claim to the district court for further consideration . . . .").

Clearly, the district court did not have the benefit of the Supreme Court's guidance in <u>Moore</u>. Consequently, in light of <u>Moore</u> and the publication of the DSM-V following Jackson's <u>Atkins</u> hearing, we reverse the district court's finding that Jackson is not intellectually disabled and remand with instructions that the district court reconsider this matter in light of that opinion. The court shall include in its reconsideration: the standard error of measurement as applied to Jackson's IQ tests administered during his youth; whether Jackson's adaptive functioning deficits are related to his subaverage intellectual functioning without requiring Jackson to demonstrate a specific link between the two; and whether Jackson's adaptive functioning deficits rather than his adaptive functioning strengths indicate that he is not intellectually disabled.

———————————————————