# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-1678

_____

Andrew Sasser

*Petitioner - Appellee*

v.

Dexter Payne

*Defendant - Appellant*

_____

No. 18-1768

_____

Andrew Sasser

*Petitioner - Appellant*

v.

Dexter Payne

*Defendant - Appellee*

_____

Appeals from United States District Court
for the Western District of Arkansas - Texarkana

_____

Submitted: September 24, 2020
Filed: June 2, 2021

_____

Before COLLOTON, GRUENDER, and GRASZ, Circuit Judges.
_____

COLLOTON, Circuit Judge.

Andrew Sasser is an Arkansas prisoner under a sentence of death for capital murder. After he pursued a direct appeal and a collateral attack on his conviction and sentence in state court, Sasser petitioned for a writ of habeas corpus in the federal district court. In a previous appeal, this court affirmed the dismissal of several claims, but remanded for further proceedings on four claims alleging ineffective assistance of counsel under the Sixth Amendment. *Sasser v. Hobbs*, 735 F.3d 833, 854-55 (8th Cir. 2013). The court also remanded for further proceedings on Sasser's claim that he is ineligible for the death penalty, due to intellectual disability, under the Eighth Amendment and the rule of *Atkins v. Virginia*, 536 U.S. 304 (2002). On remand, the district court rejected the *Atkins* claim, but granted relief on two of the ineffective-assistance claims and set aside Sasser's sentence. Both parties appeal. We affirm the denial of relief under the Eighth Amendment, but reverse the grant of relief based on alleged ineffective assistance of counsel.

I.

Sasser killed Jo Ann Kennedy in July 1993 while she was working alone as the store clerk at an E-Z Mart Store in Garland, Arkansas. Ms. Kennedy was discovered nude from the waist down; pants and panties found in the men's restroom were hers. An autopsy report showed that she died of multiple stab and cutting wounds and blunt-force head injuries. No anal or vaginal injury or spermatozoa was present. At trial, another woman testified that Sasser attacked and raped her in April 1988 while she was working alone at an E-Z Mart Store in Lewisville, Arkansas. The jury imposed a sentence of death for the murder of Ms. Kennedy after finding that an aggravating circumstance (commission of a previous violent felony) outweighed

-2-

mitigating circumstances (that Sasser would be a productive inmate, had a supporting family, and had stipulated that he caused the victim's death). *See Sasser v. State*, 902 S.W.2d 773, 774-77 (Ark. 1995).

After litigating an unsuccessful petition for postconviction relief in Arkansas, *see Sasser v. State*, 993 S.W.2d 901 (Ark. 1999) (per curiam), Sasser petitioned for a writ of habeas corpus in federal court. In this court's most recent decision on the case, the panel ruled that the district court had applied an incorrect legal standard in rejecting Sasser's Eighth Amendment claim based on alleged intellectual disability. Accordingly, the court remanded that claim to the district court for further proceedings. *Sasser*, 735 F.3d at 850.

On Sasser's claims alleging ineffective assistance of trial counsel, the prior panel ruled that all but four of Sasser's sixteen claims were procedurally barred, meritless, or both. But the court listed four remaining claims on which it said that Sasser was "entitled to an evidentiary hearing in light of . . . *Trevino v. Thaler*, 569 U.S. 413 (2013)." *Sasser*, 735 F.3d at 851. *Trevino* held that ineffective assistance of counsel in state postconviction proceedings may be grounds to excuse a procedural default under state law that would otherwise bar a prisoner from obtaining federal review of a claim alleging ineffective assistance of trial counsel. 569 U.S. at 429. The *Sasser* panel said that the district court was "authorized under 28 U.S.C. § 2254(e)(2) and required under *Trevino* to hold an evidentiary hearing on the claims." 735 F.3d at 853 (internal quotation marks and brackets omitted). In response to the State's petition for rehearing, however, the panel clarified that "on remand, the State is free to argue Sasser's postconviction counsel fully raised the four claims," *Sasser v. Hobbs*, 743 F.3d 1151, 1151 (8th Cir. 2014), such that *Trevino* would be inapplicable.

## II.

On remand, the district court considered Sasser's "four remaining claims" alleging ineffective assistance of counsel—namely, that Sasser's trial counsel ineffectively failed to:

1. Prepare for the sentencing phase of the trial;
2. Obtain a timely psychological evaluation of Sasser;
3. Meaningfully consult with a mental health professional; and
4. Object "when the prosecutor misconstrued the mitigating evidence that the defense had presented concerning [Sasser's] mental impairment and lessened culpability" or to rebut that argument.

*Sasser*, 735 F.3d at 851.

The district court declined to grant relief on two claims: Sasser abandoned the fourth claim, and the court rejected the first claim. On the first claim, the court determined that Sasser's procedural default could not be excused under *Trevino*, because he fairly presented the claim in state court during the postconviction process before declining to raise it on appeal.

As to the second and third claims, however, the court concluded that Sasser's claims as developed on remand were different from those raised in the state postconviction proceeding. The court then determined that those two claims were procedurally defaulted, but the default was excused under *Trevino* based on ineffective assistance of postconviction counsel. The court reasoned that postconviction counsel's investigation and representation were not reasonably effective, and that Sasser was prejudiced by the ineffectiveness.

On appeal, the State maintains that postconviction counsel did raise the second and third claims during the postconviction process, and they were then defaulted on appeal in state court. To address this contention, it is necessary to compare the claims in Sasser's federal habeas petition with those set forth in his petition for postconviction relief under Arkansas Rule of Criminal Procedure 37.

When this court listed claims for consideration on remand, the claims were derived from Sasser's amended federal habeas petition filed July 17, 2001. R. Doc. 23. The second claim on remand—that trial counsel failed to "obtain a timely psychological evaluation of Sasser"—was pleaded as follows in the amended habeas petition:

> Both at trial and on direct appeal, Petitioner was represented by the same attorney, Charles Potter. Mr. Potter was appointed to represent Sasser in this Capital case on August 16, 1993, *however the record reflects that virtually nothing was done by way of trial preparation until February 7, 1994, less than two weeks before the beginning of pretrial proceedings when Potter requested a psychological examination.* Some four days later, on February 11, 1994, an investigator was requested and although this record reflects that a number of pretrial motions were filed, *it is clear that trial counsel was unprepared for a Capital case at the time Sasser's trial began.*

R. Doc. 23, at 3-4 (emphases added). Sasser's amended petition alleged that this claim "was fully adjudicated in the state court." *Id.* at 4.

A review of the Rule 37 petition shows that this second claim was indeed fairly presented in state court. The petition alleged:

> *Counsel failed to request assistance of a psychological expert in sufficient time for her to prepare a proper evaluation.* Counsel obtained motions, including one for expert assistance, from the Arkansas Death

-5-

Penalty Resource Center as early as September, 1993. . . . *He nevertheless waited until February 7, 1994, to file the motion for expert assistance.* The Court granted the request on February 11, 1994, appointing Mary Pat Carlson, who has an agreement with the Court to provide psychological assistance to criminal defendants. . . . The evaluation was set for February 17, 1994, with pre-trial beginning on February 22, 1994.

> *Due to this time frame, Ms. Carlson was unable to conduct the in-depth evaluation she would ordinarily have performed.*

App. 1218-19 (emphases added). The Rule 37 petition cited the same alleged shortcoming advanced in the federal petition—namely, that counsel did not request expert assistance until February 7, 1994, and that due to the short time frame, the defense was unprepared when trial began. Sasser's federal claim that trial counsel failed to obtain a timely psychological evaluation of Sasser was therefore presented in the state postconviction court and defaulted when Sasser declined to appeal on that ground. As such, the procedural default cannot be excused based on alleged ineffectiveness of state postconviction counsel. *Thomas v. Payne*, 960 F.3d 465, 473 (8th Cir. 2020); *Arnold v. Dormire*, 675 F.3d 1082, 1086-87 (8th Cir. 2012).

The third claim on remand—that trial counsel failed to "meaningfully consult with a mental health professional"—was pleaded this way in the amended federal habeas petition: "Trial counsel requested a psychological exam on February 7, 1994, however after the exam was performed, counsel failed to meaningfully consult with the examiner so as to prepare for her trial testimony." R. Doc. 23, at 4. Again, the amended petition asserted that this claim was fully adjudicated in state court. The Rule 37 petition confirms that the same claim was fairly presented in state court. It alleged: "Counsel also failed to consult meaningfully with Ms. Carlson prior to trial and as a result, relevant mitigating evidence was inadequately presented, as demonstrated by the fact that the jury did not find that evidence of any mental disease/defect was presented . . . , when in fact there was." App. 1219.

-6-

The state postconviction court construed this claim as a challenge to counsel's performance at the penalty phase and rejected it: "Trial counsel is taken to task for failing to have adequately prepared the testimony of his only expert witness during the penalty phase, Mary Pat Carlson. This contention is simply not borne out by the testimony at the Rule 37 hearing. Trial counsel testified that he believed that Ms. Carlson was adequately prepared and that she never indicated that she did not have enough time to evaluate the petitioner."

The third claim on remand, therefore, was fairly presented to the state postconviction court in Sasser's Rule 37 motion, but the claim was procedurally defaulted on appeal. Accordingly, as with the second claim, the procedural default cannot be excused based on alleged ineffectiveness of state postconviction counsel. *Arnold*, 675 F.3d at 1086-87.

The district court reached a different conclusion on the view that "the second and third claims as characterized on remand" were different from the claims raised in the Rule 37 petition. The court characterized the second claim on remand as one that "trial counsel should have begun his preparations and obtained a psychological evaluation earlier so that he would know that he needed a qualified and licensed expert, and not Carlson, to present mental health evidence in mitigation." The court described the third claim on remand as one that counsel "should have had meaningful consultation with a qualified and licensed mental health professional" other than Carlson. Neither of these claims, the court concluded, was fairly presented in the Rule 37 petition.

We reject this conclusion because the "claims as characterized on remand" are not the claims that were pleaded in the amended petition and remanded by the panel in *Sasser v. Hobbs*. Sasser's effort to bring new ineffective-assistance claims on remand constituted an unauthorized second or successive habeas petition that should have been dismissed. *See* 28 U.S.C. § 2244(b)(3)(A).

The claims considered by the district court on remand first appeared in Sasser's second supplemental and amended habeas petition, dated September 3, 2004. R. Doc. 48. That filing came after this court remanded the case in August 2003 for the limited purpose of considering whether the Eighth Amendment prohibited Sasser's execution in light of *Atkins v. Virginia*. R. Doc. 37. The second amended petition raised new claims that trial counsel was ineffective for failing to obtain an adequate social history of Sasser or to retain "qualified experts" to evaluate Sasser completely, so that Sasser could present additional mitigating evidence at sentencing. R. Doc. 48, at 16-17, 22.

The district court in January 2007 concluded that these claims should have been known when Sasser filed his first habeas petition, and the court thus dismissed them with prejudice as abusive. R. Doc. 71, at 18. This court on appeal agreed that the new ineffective-assistance claims were not properly before the district court after the 2003 remand. *Sasser v. Norris*, 553 F.3d 1121, 1127 (8th Cir. 2009). Sasser's effort to revive these ineffective-assistance claims during the most recent remand functioned as a second or successive habeas petition and an abuse of the writ.

The evidentiary hearing on remand was not a proper forum for Sasser to develop new federal claims that were not raised in his first habeas petition. This court's statement that Sasser was entitled to an evidentiary hearing on remand was limited to the question whether Sasser could show cause and prejudice under *Trevino* to excuse any procedural default allegedly caused by ineffective assistance of postconviction counsel. The panel clarified in response to a rehearing petition that the State was free to argue on remand that Sasser fairly presented his federal claims in the Rule 37 motion. The federal claims at issue in that comparison were only those claims presented in Sasser's amended habeas petition in 2001, R. Doc. 23, not new ineffective-assistance claims that were improperly raised in the second amended petition in 2004, R. Doc. 48, or developed in an evidentiary hearing after the remand in 2014.

We therefore conclude that the district court's grant of relief based on Sasser's second and third claims "as characterized on remand" was in error. The second and third claims on remand were fairly presented in Sasser's Rule 37 motion, and then abandoned on appeal, so alleged ineffective assistance of postconviction counsel is not cause to excuse Sasser's procedural default. The claims identified by the district court on remand were not presented in Sasser's first federal habeas petition, and they are barred as a second or successive petition and an abuse of the writ.

## III.

On Sasser's claim asserting ineligibility for execution under the Eighth Amendment based on intellectual disability, this court in 2014 remanded the case "so that the district court may answer the critical factual questions in the first instance according to the correct legal standard." *Sasser*, 735 F.3d at 850. The district court on remand detailed several factual findings and legal conclusions.

To prove that he was intellectually disabled, Sasser was required to prove several elements by a preponderance of the evidence: (1) "Significantly subaverage general intellectual functioning"; (2) "[a] significant deficit or impairment in adaptive functioning"; (3) "[t]hat both of the above 'manifest[ed] . . . no later than age eighteen'"; and (4) "[a] deficit in adaptive behavior." *Id.* at 843 (quoting Ark. Code Ann. § 5-4-618(a)). If Sasser was intellectually disabled "at the time of committing the crime," *id.* at 846; *see* Ark. Code Ann. § 5-4-618(b)-(c), then his execution would be prohibited by the Eighth Amendment. *See Atkins*, 536 U.S. at 321; *Sasser*, 735 F.3d at 845-46 & n.7.

### A.

The district court first considered whether Sasser could prove significantly subaverage intellectual functioning that manifested no later than age eighteen.

Sasser's intelligence quotient (IQ) scores were 83 on a 2010 test, and 79 on a 1994 test; the court adjusted the 1994 score downward to 75 to account for "norm obsolescence." The score ranges were 78 to 88 for the 2010 test, and 70 to 80 for the 1994 test. The court concluded that both scores fell within "the range described as 'borderline intellectual functioning' rather than mental retardation."

Because IQ scores are not conclusive evidence of subaverage intellectual functioning, *Sasser*, 735 F.3d at 844, the court considered additional evidence—namely, Sasser's scores on an aptitude achievement test, a military admission exam, and academic standardized tests; his high school grades; and his performance on a driver's license exam administered shortly before Kennedy's murder. Weighing this evidence along with Sasser's IQ scores, the court concluded that only the lowest ends of the IQ ranges "had any statistical significance," and the other evidence indicated "intelligence that . . . was not so subaverage as to meet the standard for mental retardation." But the court recognized that "impairments in adaptive functioning, rather than an IQ score, are the clearest indicators of intellectual disability," so proceeded to analyze the other criteria for intellectual disability.

The court next considered whether Sasser had proven a significant deficit or impairment in adaptive functioning that manifested no later than age eighteen. The parties disputed whether the court should apply the standard from the fourth or fifth edition of the American Psychological Association's Diagnostic and Statistical Manual of Mental Disorders, known as the *DSM-IV-TR* and *DSM-V*, respectively. The court chose to rely on the fourth edition, because the "updated medical standards in the *DSM-V*" did not "have any bearing on [Sasser's] case," but the court also found that "the same decision would be reached under both definitions."

To show a significant deficit under the *DSM-IV-TR*, Sasser was required to prove "significant limitations in at least two . . . skill areas." *Jackson v. Norris*, 615 F.3d 959, 962 (8th Cir. 2010) (quoting *DSM-IV-TR*, at 41). The court considered

evidence of Sasser's deficits in the areas of "academic skills, work, and social/interpersonal skills."

On academic skills, the court considered Sasser's enrollment in "remedial or special courses throughout his school years," reports on Sasser's functioning from school teachers and peers to expert psychologists, and Sasser's participation in a prison pre-release program designed to prepare him for a driver's license examination. Sasser achieved perfect scores on both the written and sign portions of the driver's license test in 1993, shortly before Kennedy's murder. The court noted "that ordered environments like prison may result in artificial improvements to adaptive functioning," and thus did not consider Sasser's prison performance as evidence of *improved* adaptive functioning. But the court did view the information "as evidence undermining Sasser's claimed limitations in areas of adaptive functioning prior to incarceration." The court found that its conclusion was bolstered by statements from school friends "that Sasser may have suffered as much from a lack of motivation as a lack of ability." The court ultimately found that Sasser had not proven a significant limitation in academic skills.

On work skills, the court considered reports on Sasser's jobs from his early life, his time in prison, and before and after his prior incarceration. Sasser worked in "basic position[s]" and completed "repetitive, simple task[s]" in some jobs after high school. But other reports indicated that Sasser was able to work independently at a range of tasks on a farm before the age of eighteen, and that he worked successfully "with various levels of supervision" while imprisoned. The court found that Sasser proved neither a significant limitation in work, nor any limitation that manifested before the age of eighteen.

The court next analyzed Sasser's alleged deficit in the social and interpersonal skill domain. Sasser's expert interviewed Sasser's teachers, coaches, and peers from middle school and high school. They reported that Sasser "stared blankly during

conversations," reacted inappropriately to jokes, was "treated as a nerd or weird student," and had few friends. But the court also considered evidence that pointed in the other direction, including reports that Sasser had friends in high school, "was a good storyteller," and had girlfriends during high school and as an adult, both before and after his prior term of imprisonment. Based on the entirety of the evidence, the court found that Sasser had not established a significant deficit in social and interpersonal skills.

The court also considered whether Sasser had demonstrated a deficit in adaptive behavior. Because this criterion "largely duplicates the second prong" of adaptive functioning deficits, *Sasser*, 735 F.3d at 845, and because Sasser presented no additional evidence, the court found that Sasser failed to prove a behavioral deficit for the same reasons he failed to prove a functioning deficit. The court thus found that Sasser was not intellectually disabled at the time he committed his offense of murder.

The court then analyzed Sasser's claim alternatively under the framework of the *DSM-V*. To prove adaptive functioning deficits under the *DSM-IV-TR*, Sasser was required to show "significant limitations in adaptive functioning in at least two . . . skill areas," including "social/interpersonal skills," "functional academic skills," and "work." *DSM-IV-TR*, at 41. Under the *DSM-V*, he was required to prove that he was "sufficiently impaired" in "at least one domain of adaptive functioning—conceptual, social, or practical"—so as to require "ongoing support" to "perform adequately." *DSM-V*, at 38. The district court explained that the three *DSM-IV-TR* "skill areas" in which Sasser claimed impairments are now "heavily centered" in three different *DSM-V* "domains": academic skills in the conceptual domain, work skills in the practical domain, and social/interpersonal skills in the social domain. *See DSM-IV-TR*, at 42; *DSM-V*, at 37. Because Sasser failed to prove "any limitation in these areas" that was sufficiently significant to require ongoing support, the court

concluded that Sasser could not prove intellectual disability under the updated *DSM-V* criteria for the same reasons he failed to do so under the *DSM-IV-TR* criteria.

B.

Sasser challenges the district court's resolution of his Eighth Amendment claim on several grounds. We review the legal standard applicable to an *Atkins* claim *de novo*, and the factual finding whether an individual is intellectually disabled for clear error. *Sasser*, 735 F.3d at 841-42.

First, Sasser argues that the court erred by applying the diagnostic framework of the *DSM-IV-TR*, rather than the *DSM-V*. Analysis of intellectual disability "must be 'informed by the medical community's diagnostic framework.'" *Moore v. Texas*, 137 S. Ct. 1039, 1048 (2017) (quoting *Hall v. Florida*, 572 U.S. 701, 721 (2014)). To be "informed by the medical community does not demand adherence to everything stated in the latest medical guide," but a court may not "disregard current medical standards." *Id.* at 1049. Sasser seems to urge a rule that would require a court to reassess an *Atkins* claim each time the medical profession revises its standards, but we need not resolve that issue here. The district court in this case considered Sasser's claim under both the *DSM-IV-TR* and *DSM-V* criteria, and reached the same conclusion based on each, so there was no legal error.

Sasser contends that the district court tied its analysis of his intellectual functioning to the analysis of his adaptive deficits, and therefore relied too heavily on "non-clinical criteria." The court found that Sasser failed to prove significantly subaverage intellectual functioning. The ruling noted that IQ scores are inconclusive, and reasoned that if Sasser demonstrated a significant deficit or impairment in adaptive functioning, then that showing would be evidence that "Sasser's inarguably subaverage general intelligence—as measured by IQ testing, school grades, and other similar markers—was *significantly* subaverage." R. Doc. 283, at 23 (emphasis

-13-

added).  Where "the lower end of [a defendant's] score range falls at or below 70," courts must "move on to consider . . . adaptive functioning."  *Moore*, 137 S. Ct. at 1049.  The lowest end of Sasser's lower IQ score range was 70, so the district court did not err by considering additional indicia of intellectual disability.  This inquiry necessarily required consideration of "non-clinical" evidence, including statements from people who knew Sasser during his developmental years.

Sasser challenges the court's alleged use of "lay stereotypes" as evidence of his adaptive functioning.  He points out that factors such as whether a defendant's "conduct showed 'leadership,'" or whether "those who knew the person best during the developmental stage thought of him as mentally retarded" are not dispositive, because those factors are not grounded in prevailing medical practice and invite "lay perceptions of intellectual disability."  *Moore v. Texas*, 139 S. Ct. 666, 669 (2019) (per curiam) (internal quotations omitted).

Some evidence to which Sasser objects came from the State's expert psychologist, Dr. Roger Moore, who interviewed Sasser's peers, family members, and former employers to learn about his adaptive deficits.  Dr. Moore necessarily considered the information retrospectively to analyze Sasser's adaptive functioning during his adolescence.  For example, Dr. Moore interviewed an employer on whose farm Sasser had worked during high school.  The employer told Dr. Moore that Sasser was capable of independent work if he found it engaging.  The employer did not render an opinion on whether Sasser was intellectually disabled or whether his conduct demonstrated leadership.  *Cf. Moore*, 139 S. Ct. at 669.  And Sasser's own expert psychologist, Dr. Jethro Toomer, also considered "firsthand accounts of Sasser's behavior by people who knew him before he turned eighteen years old," including former classmates.  *Sasser*, 735 F.3d at 841.  The district court permissibly considered expert testimony or reports that conveyed statements from people who knew Sasser during his developmental years.

Sasser also objects to reliance on statements by a prison official who supervised Sasser's work; the official testified that Sasser worked well and had "no problems doing light work as far as I know." The court, however, cited only the fact that Sasser earned credit toward his sentence, "which could only be given if he was doing the job each position required him to do." The court found that this evidence indicated that Sasser's limitations may be due more to a lack of engagement or motivation than to a significant limitation. Evidence of Sasser's successful work while incarcerated was relevant to the analysis of Sasser's claimed adaptive deficits at the time of his crime, and there was no error in considering it.

Sasser argues that the court unduly emphasized evidence of his adaptive strengths, and used it to "offset proven deficits." Intellectual disability depends on evidence of adaptive deficits, and a court should not consider "significant limitations in adaptive skills" to be "outweighed by potential strengths in *other* adaptive skills." *Jackson v. Kelley*, 898 F.3d 859, 864 (8th Cir. 2018) (emphasis added).

The district court did not err in its consideration of adaptive strengths. The court properly recognized that it could not balance evidence of Sasser's strengths in one skill area against evidence of his deficits in a different skill area. The court said that it is an "open question whether strengths in one area of adaptive functioning can be weighed against weaknesses *in the same area* when analyzing whether a person has limitations in that area." R. Doc. 283, at 26 (emphasis added). *Moore* is not to the contrary; the Court there assumed for the sake of analysis that "clinicians would consider adaptive strengths alongside adaptive weaknesses within the same adaptive-skill domain." 137 S. Ct. at 1050 n.8.

Citing *Moore*, Sasser argues that a court considering intellectual disability must focus *solely* on evidence of adaptive deficits. *Moore*, however, observed only that there was no "clinical authority permitting the arbitrary offsetting of deficits against unconnected strengths." *Id*. The district court did not balance unconnected strengths

-15-

against weaknesses, but "weigh[ed] evidence of strengths against evidence of limitations in order to see whether Sasser . . . met his burden to show" any limitation in a single skill domain. R. Doc. 283, at 28 n.10. For example, the court addressed conflicting evidence of Sasser's social and interpersonal skills: one classmate testified that Sasser had few friends, but other classmates testified that he had friends. The district court did not weigh evidence across skill domains, but properly considered all available evidence of Sasser's adaptive functioning in order to make the necessary findings of fact in each relevant domain.

Sasser challenges the district court's consideration of evidence of his functioning in prison to support the conclusion that he could not demonstrate adaptive deficits. Medical experts "caution against reliance on adaptive strengths developed 'in a controlled setting,' as a prison surely is," and seek to obtain corroborating evidence of functioning in uncontrolled settings. *Moore*, 137 S. Ct. at 1050 (quoting *DSM-V*, at 38). The district court, however, was "mindful that ordered environments like prison may result in artificial improvements to adaptive functioning," and thus did not rely on Sasser's behavior in prison as evidence of improved adaptive functioning. Rather, the court found that evidence of Sasser's performance in prison was consistent with other evidence that he "suffered as much from a lack of motivation as a lack of ability." On academics, the court found that Sasser's performance on the driver's license examination while incarcerated supported a statement from a school friend that Sasser was "more capable than his grades reflected." On work, the court found that Sasser's successful employment in multiple jobs while incarcerated corroborated testimony that Sasser was capable of independent farm work before he turned eighteen. The court properly recognized the risk that prison behavior might reflect artificial improvements in functioning, and adequately limited its consideration of prison evidence.

Next, Sasser argues the court inappropriately required him to prove the existence of adaptive functioning deficits "beyond the developmental period" ending

at age eighteen. The court explained that Sasser's evidence of academic skill limitations was "primarily limited to his school career." Because that evidence was "called into question by reports and evidence that Sasser's performance was due at least in part to a lack of motivation," the court found that Sasser had not "met his burden to demonstrate . . . that he had a significant limitation in academic skills at the time he committed the crime."

Sasser argues that the relevant time for assessing his academic functioning skills was before the age of eighteen, because a significant deficit or impairment must manifest during the developmental period. *See* Ark. Code Ann. § 5-4-618(a)(1)(A). But the *DSM-IV-TR* criteria require both an "onset" that "is before age 18 years," and a showing of "[c]oncurrent deficits or impairments in *present* adaptive functioning" in at least two skill areas. *DSM-IV-TR*, at 49 (emphasis added). Likewise, the *DSM-V* criteria require both an "onset during the developmental period," that is, "during childhood or adolescence," and a showing that "at least one domain of adaptive functioning . . . *is* sufficiently impaired that ongoing support is needed . . . to perform adequately." *DSM-V*, at 38 (emphasis added). In any event, the court found no significant deficits at either point in time, and there was no error in the time period considered.

Sasser contends that the court created "a composite portrait" of his adaptive functioning by piecing together evidence from different points in his life. The court considered evidence of Sasser's functioning during the developmental period and near the time of his crime, both of which were "relevant points in time." *Sasser*, 735 F.3d at 849 n.10. Some evidence from later in Sasser's life confirmed or supported evidence from the developmental period, but it cannot be said that the court on remand mistakenly "mixed and matched evidence of Sasser's capacities from different points in his life, creating a composite portrait of Sasser" at an artificial peak. *Id.* at 849. For example, the court considered evidence that Sasser was able to work independently at manual farm tasks as an adolescent, and found this evidence

consistent with Sasser's success while working as an electrician and furniture manufacturer in prison. On social skills, the court cited reports that Sasser had friends in school and a high school girlfriend, but found that even evidence suggesting that he was not liked by peers and did not have a girlfriend was not good evidence of a substantial limitation in social skills during the developmental period. The court properly analyzed whether Sasser demonstrated intellectual disability at a relevant point in time and found that he failed to do so.

Finally, Sasser argues that the district court required him to "rule out other potential contributing causes" of his adaptive deficits by noting that he "may have suffered as much from a lack of motivation as a lack of ability." "[A] defendant is not required to rule out other contributing causes of his adaptive deficits in order to meet the standard for intellectual disability." *Jackson*, 898 F.3d at 868 (internal quotation omitted). Stated differently, if an individual has demonstrated significant intellectual impairment and significant adaptive deficits, a court may not *also* require him to prove that his intellectual disability is the cause of those deficits. *See id.* But the district court did not require such a showing here, because it found that Sasser failed to prove the existence of any significant functioning deficits in the first place.

\*    \*    \*

For these reasons, we reverse the grant of relief with respect to Sasser's ineffective-assistance claims, affirm the denial of relief on his *Atkins* claim, and remand with directions to dismiss the petition.

_____